49 P.3d 353

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Peter Alvin POAIPUNI, Jr.,
Defendant–Appellant.**

No. 22756.

Supreme Court of Hawai'i.

May 14, 2002.

Reconsideration Granted in Part and
Denied in Part and Amended
June 21, 2002.

388

Edwin Lauder Baker, on the briefs, for the defendant-appellant, Peter Alvin Poaipuni, Jr.

Richard K. Minatoya, Deputy Prosecuting Attorney, on the briefs, for the plaintiff-appellee State of Hawai'i.

MOON, C.J., LEVINSON, and ACOBA, JJ.; with ACOBA, J., Concurring separately, and with whom LEVINSON, J. joins; MOON, C.J., Concurring separately; and RAMIL, J., Dissenting, with whom NAKAYAMA, J., joins.

Opinion of the Court by LEVINSON, J.

The defendant-appellant Peter Alvin Poaipuni, Jr., appeals the judgment of the second circuit court, the Honorable Artemio C. Baxa presiding, convicting him of and sentencing him for unlawful possession of a firearm, in violation of Hawai'i Revised Statutes (HRS) § 134-7(b) (1993 and Supp.1998). On appeal, Poaipuni advances five points of error, all of which implicate the circuit court's receipt of the firearms predicating the charge against him and his statement to police officers confessing that he had possessed them into evidence at trial.[1] Specifically, Poaipuni contends that the circuit court erred in partially denying his pretrial motion to suppress the firearms because (1) his father's consent to search the toolshed in which the police found the firearms was not voluntary, knowing, and intelligent and (2) his father's consent was the result of exploitation by the police of an unlawful search warrant, thereby rendering the firearms "tainted fruit of the poisonous tree." As to his subsequent statement confessing to the police that he had possessed the firearms, Poaipuini asserts that (3) the circuit court erred in ruling *in limine* that his statement was voluntary and, therefore, admissible at trial. In addition, Poaipuni urges that (4) his trial counsel provided him with ineffective assistance, reflected most notably in counsel's failure to seek suppression of his confession on the ground that it was tainted by the execution of the unlawful search warrant. Finally, Poaipuni posits that (5) the circuit court "committed plain error when it failed, *sua sponte*, to suppress" the firearms and his statement "as fruit of an illegal search."

We hold that the firearms and Poaipuni's statement constituted "fruit of the poisonous

---

1. Poaipuni advances his points of error on appeal under both the Hawai'i Constitution and the United States Constitution; as to the former, he specifically invokes article I, sections 7 (1978), 10 (1982), and 14 (1978). Article I, section 7 provides that

[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the per-

sons or things to be seized or the communications sought to be intercepted.

Article I, section 10 provides in relevant part that "[n]o person shall ... be compelled in any criminal case to be a witness against oneself," and article I, section 14 provides in relevant part that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for the accused's defense." We base our holdings upon these provisions, and, consequently, we do not address Poaipuni's federal constitutional claims.

tree," because, but for the exploitation by the police of a prior illegality—*i.e.*, the execution of an unlawful search warrant—the police would not have learned of the firearms, obtained the father's consent to search the toolshed, discovered the firearms, questioned Poaipuni about the firearms, and obtained Poaipuni's statement confessing that he had possessed the firearms.

## I. *BACKGROUND*

On the morning of July 7, 1998, Maui County Police Department (MPD) officers arrested Poaipuni in connection with several burglary offenses and retained him in police custody. Later that day, MPD Detective James Fletcher obtained a warrant to search Poaipuni's family home, which Poaipuni's father owned and in which Poaipuni resided with his father and other family members.

Detective Fletcher's affidavit in support of the search warrant asserted that he had been assigned to investigate second degree burglary offenses, involving the thefts of two automated teller machines located within commercial establishments, in connection with which he was investigating (1) three different "premises," one of which he believed that Poaipuni "occupied," and (2) a "Toyota pick up truck, maroon in color" that had been "found" in Poaipuni's possession. Detective Fletcher sought warrants to search the three premises and the truck for items related to the thefts.[2]

As the factual basis for issuing the search warrants, Detective Fletcher related that the first theft occurred during the night of June 30, 1998, when "unknown person(s) drove a forklift into" a grocery store and "stole" an automated teller machine. According to Detective Fletcher, "[in] this incident[,] a white Jeep pickup truck with no license plates [was] reported in the area just prior to the break-in" and "[t]he thief" absconded with the automated teller machine. Detective Fletcher's affidavit did not reflect the source of the foregoing information. As to the second theft, Detective Fletcher related that, approximately a week later, "unknown per-

son(s) drove a white Jeep pickup truck into" a sundries store and stole another automated teller machine. Detective Fletcher averred that, "[a]ccording to witnesses, two males loaded the ATM into the back of a pickup truck." However, the machine fell from the bed of the truck while police were pursuing it, and, consequently, the police recovered the ATM. "In both instances," averred Detective Fletcher, "a white Jeep pickup was observed to be involved in the theft[s]." The truck was eventually recovered by police officers, apparently abandoned in a sugar cane field.

Detective Fletcher averred that, during the interval between the two thefts, a police officer had observed the "same white Jeep pickup truck" outside the residence of Jeffrey Gray (which was one of the premises for which Detective Fletcher sought a search warrant) while the officer was speaking with Harry "Bobo" Pahukoa, III. Detective Fletcher's affidavit, however, did not explain the basis for concluding that the truck was, in fact, the "same" as that used during the two thefts. Subsequently, when "speak[ing] with" Pahukoa and Poaipuni on July 7, 1998—the day after the second theft occurred—"regarding a separate matter," Poaipuni informed police officers that he and Pahukoa had spent the previous night at Poaipuni's family home. Detective Fletcher "believe[d]" that it was "odd" for Pahukoa to have done so, inasmuch as he "had his own residence" elsewhere.

Because the Criminal Investigation Division of the MPD had "received information from the Crime Stoppers bulletin" that Pahukoa "was responsible for the theft of" the first automated teller machine, Detective Fletcher averred that he "believe[d] that" Poaipuni, Pahukoa, and Gray were all involved in both thefts. Hence, he "desire[d] to conduct a search" of their respective homes and Poaipuni's maroon pickup truck. On the basis of Detective Fletcher's affidavit,

---

**2.** Detective Fletcher's affidavit specifically requested warrants to search for "[a]n unascertainable amount of United States currency in $20.00 denominations," as well as any "[a]rticles of identification" and "[a]ny part of an automated teller machine."

the district court of the second circuit issued the requested search warrants.[3]

Thereafter, Detective Fletcher, together with several other police officers, executed the search warrant on Poaipuni's family home at approximately 7:00 p.m. on July 7, 1998, while Poaipuni remained in police custody elsewhere. Detective Fletcher introduced himself, "gave [Poaipuni's father] a copy of the search warrant[,] and explained what [he and the other officers] were about to do." The officers entered the home, "secured" it by locating all of the occupants, and directed the occupants into the family room, where they remained, under the supervision of a police officer, throughout the remainder of the search, which appears to have consumed several hours.

According to Detective Fletcher, while the search was underway, Poaipuni's father asked to speak with him, informed him that his son had placed a case containing firearms in a tool shed, which was located on the property but not attached to the house, and consented to a search of the tool shed.[4] Within the tool shed, Detective Fletcher found the case, which, he testified, he opened at Poaipuni's father's request. Inside the case, Detective Fletcher found numerous firearms. In addition to the firearms, some ammunition was eventually discovered within Poaipuni's bedroom. The search, however, unearthed no evidence relating to the burglaries or automated teller machine thefts, and Poaipuni was apparently never charged with their commission.

Subsequently, Detective Fletcher returned to the police station at which Poaipuni was being held in police custody. Shortly thereafter, Detective Mervin Holokai, joined by Detective Fletcher, commenced interrogating Poaipuni. Detective Holokai informed Poaipuni that he wished to discuss the first automated teller machine theft with him, that another detective desired to speak to him about an unrelated matter, and that Detective Fletcher wanted to question him in connection with the second automated teller machine theft. Detective Holokai provided Poaipuni with a written warning and waiver form informing him of his constitutional rights, which Poaipuni initialed and signed. During the interrogation, Detective Fletcher questioned Poaipuni regarding the firearms that he had found in the tool shed. As a result, Poaipuni confessed that he had possessed them—explaining that a friend had given them to him to hold until the friend was released from incarceration—and that he had been aware that it was illegal for him, a convicted felon, to do so.

In a pretrial motion to suppress, Poaipuni sought to exclude at trial "all evidence recovered as a result of the execution of [the] search warrant." Although his motion to suppress spoke generally of "all evidence," it and the arguments advanced by the parties at the suppression hearing clearly reflect that Poaipuni's motion to suppress encompassed only the firearms and ammunition. Poaipuni asserted (1) that Detective Fletcher's affidavit failed to establish probable cause to justify the search and (2) that, in executing the warrant, the police exceeded its scope, insofar as the warrant authorized only a search of the house and did not authorize a search of the tool shed.[5] In its memorandum in opposition to the motion, the prosecution argued that the search warrant was issued upon probable cause and that Poaipuni's father's consent justified the officers in searching the tool shed.

After Detective Fletcher and Poaipuni's father testified at the hearing on Poaipuni's motion to suppress, the circuit court invited argument addressing the validity of Poaipu-

3. The warrant issued to search Poaipuni's home authorized the police to search for and seize, as Detective Fletcher had requested, see supra note 2, "[a]n unascertainable amount of United State currency in $20.00 denominations," any "[a]rticles of identification," and "[a]ny part of an automated teller machine." Furthermore, the warrant identified the address of Poaipuni's home and described the premises to be searched as "a single story wooden structure resembling a dwelling with a wood finish with a wood shingle roof with the numbers '22' in black facing the roadway," which was "believed to be occupied by" Poaipuni.

4. The record also contains a copy of a "consent-to-search" form that bears Poaipuni's father's signature.

5. Appended to Poaipuni's motion to suppress was a "declaration" of his trial counsel but not a memorandum of law in support of the motion.

ni's father's consent, after which the circuit court orally ruled (1) that Detective Fletcher's affidavit was insufficient to establish probable cause to search the residence but (2) that the toolshed "was separate and apart from what was going to be searched under the ... defective warrant." The circuit court found that Poaipuni's father had voluntarily consented to the search of the tool shed and therefore ruled "that the evidence obtained from the tool shed was not a fruit of the defective warrant." Because neither party had yet orally argued the extent of the taint resulting from the defective warrant, Poaipuni urged the circuit court to reconsider its ruling. The circuit court believed, however, that it had "made the right decision[.]" Nowhere in his motion to suppress or at any point during the hearing on it did Poaipuni identify his statement to the police as derivative evidence that should be suppressed as tainted fruit of the defective warrant; rather, Poaipuni sought only the exclusion of the physical evidence—i.e., the firearms and ammunition—that the police found while executing the defective warrant.

In its written findings of fact, conclusions of law, and order denying Poaipuni's motion in part and granting it in part, the circuit court concluded that Detective Fletcher's affidavit "did not [contain] sufficient probable cause for the issuance of the warrant executed on [Poaipuni's] residence." Accordingly, the circuit court ruled that "[a]ll evidence recovered by the police as a result of the search" upon the residence—which included ammunition found in Poaipuni's bedroom—was "suppressed" and that the prosecution was "precluded from the use [of it] at trial." However, as to the firearms found in the tool shed, the circuit court observed that "[a] search based on consent is a recognized exception" to the warrant requirement, so long as the prosecution establishes that the consent was voluntarily given. Having found that Poaipuni's father had "freely, voluntarily, knowingly, and intelligently" consented to the search of the tool shed, the circuit court concluded that his consent was "independent [of] and distinct from the search warrant executed on [the] residence." As such, the circuit court concluded that Detective Fletcher had discovered the firearms as the result of an "independent source" and, therefore, that the firearms did not constitute tainted "fruit of the poisonous tree." Thus, although the circuit court granted Poaipuni's motion to the extent of suppressing "all evidence recovered from the residence," it denied the motion with respect to "all the evidence recovered from the toolshed."

After a jury was empaneled, but before trial commenced, the circuit court, apparently upon Poaipuni's oral motion, conducted a voluntariness hearing in connection with Poaipuni's statement to the police regarding the firearms. Poaipuni argued that, when Detectives Fletcher and Holokai had interrogated him, he had expressly waived his constitutional rights only as to the specific criminal matters to which Detective Holokai had referred (i.e., the two automated teller machine thefts and a third criminal matter), which were unrelated to the present prosecution regarding his possession of the firearms. As such, Poaipuni urged that his waiver was not knowing, intelligent, and voluntary as to the firearms offense. The prosecution contended that Poaipuni's waiver extended to any and all questions that the interrogating officers posed to him and, thus, was valid. The circuit court agreed with the prosecution, ruling that Poaipuni had knowingly, intelligently, and voluntarily given his statement to the police and that it was therefore admissible at trial. Once again, Poaipuni failed to assert that his statement, even if knowingly, intelligently, and voluntarily given, was inadmissible as tainted fruit of the defective warrant.

The prosecution introduced the firearms into evidence at trial, as well as photographs of the firearms, and, during Detective Fletcher's testimony, introduced an audio tape of the relevant portions of Poaipuni's statement into evidence, which it played for the jury. In conjunction with playing the audio tape, the prosecution provided the jury with copies of a typewritten transcription, which was marked as an exhibit for identification but not received into evidence. Except on grounds immaterial for present purposes, Poaipuni did not object to the prosecution's introduction of the foregoing evidence.

The jury convicted Poaipuni as charged. Poaipuni has timely appealed his conviction and sentence. The prosecution has not appealed the circuit court's ruling that the search warrant was defective by virtue of the insufficiency of Detective Fletcher's affidavit to support a finding of probable cause to search Poaipuni's residence.

## II. STANDARDS OF REVIEW

### A. Circuit Court's Ruling On A Motion To Suppress

"We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case.... Thus, we review questions of constitutional law under the 'right/wrong' standard." *State v. Jenkins*, 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000) (citations, some quotation signals, and some ellipsis points omitted). Accordingly, "[w]e review the circuit court's ruling on a motion to suppress *de novo* to determine whether the ruling was 'right' or 'wrong.'" *Id.* (citations and some quotation signals omitted).

### B. Ineffective Assistance Of Counsel

In assessing claims of ineffective assistance of counsel, the applicable standard is whether, viewed as a whole, the assistance provided was within the range of competence demanded of attorneys in criminal cases....

> General claims of ineffectiveness are insufficient and every action or omission is not subject to inquiry. Specific actions or omissions alleged to be error but which had an obvious tactical basis for *benefitting* the defendants case will not be subject to further scrutiny. If, however, the action or omission had no obvious basis for benefitting the defendant's case *and* it resulted in the withdrawal or substantial impairment of a potentially meritorious defense, then it will be evaluated as information that an ordinary competent criminal attorney should have had. *Briones v. State*, 74 Haw. 442, 462–63, 848 P.2d 966, 976 (1993) (emphasis in original) (internal citations omitted). The burden of establishing ineffective assistance of counsel rests with

the defendant and can only be met by demonstrating specific errors or omissions resulted in the withdrawal or substantial impairment of a meritorious defense.

"Determining whether a defense is 'potentially meritorious' requires an evaluation of the possible, rather than the probable, effect of the defense on the decision maker.... Accordingly, no showing of actual prejudice is required to prove ineffective assistance of counsel." *Briones*, 74 Haw. at 464, 848 P.2d at 977 (citing *State v. Aplaca*, 74 Haw. 54, 73, 837 P.2d 1298, 1308 (1992)).

*State v. Pacheco*, 96 Hawai'i 83, 93–94, 26 P.3d 572, 582–83 (2001) (quoting *Dan v. State*, 76 Hawai'i 423, 427, 879 P.2d 528, 533 (1994)) (original brackets and some quotation signals, ellipses points, and citations omitted) (some ellipses points added and some in original).

## III. DISCUSSION

On appeal, Poaipuni contends, *inter alia*, that the firearms that Detective Fletcher found in the tool shed and his subsequent inculpatory statement, given in response to Detective Fletcher's questions regarding the firearms, were inadmissible at trial because they constituted tainted fruit of the poisonous tree—*i.e.*, derivative evidence obtained as a result of the execution by the police of an unlawful search warrant. For the reasons discussed below, we agree and, therefore, do not reach Poaipuni's remaining points of error on appeal.

"[T]he 'fruit of the poisonous tree' doctrine 'prohibits the use of evidence at trial which comes to light as a result of the exploitation of a previous illegal act of the police.'" *State v. Fukusaku*, 85 Hawai'i 462, 946 P.2d 32 (1997) (quoting *State v. Medeiros*, 4 Haw. App. 248, 251 n. 4, 665 P.2d 181, 184 n. 4 (1983)). Under the fruit of the poisonous tree doctrine,

> [a]dmissibility is determined by ascertaining whether the evidence objected to as being 'fruit' was discovered or became known by the exploitation of the prior illegality or by other means sufficiently

distinguished as to purge the later evidence of the initial taint.... Where the government proves that the evidence was discovered through information from an independent source or where the connection between the illegal acts and the discovery of the evidence is so attenuated that the taint has been dissipated, the evidence is not a 'fruit' and, therefore, is admissible....

*Id.* (quoting *Medeiros* and citing *State v. Lopez*, 78 Hawai'i 433, 447, 896 P.2d 889, 903 (1995), and *State v. Pauū*, 72 Haw. 505, 509–10, 824 P.2d 833, 836 (1992)) (internal citations omitted). In other words, the ultimate question that the fruit of the poisonous tree doctrine poses is as follows: Disregarding the prior illegality, would the police nevertheless have discovered the evidence? In the context of the present matter, the question is whether the police would have discovered the firearms and obtained Poaipuni's confession that he possessed them had the search warrant never been issued.[6] On the record before us, the answer is clearly that, absent the search warrant, the police would not have discovered the firearms and, *a fortiori*, would not have questioned Poaipuni about them.

### A. *The Firearms*

The prosecution does not contest the circuit court's conclusion that Detective Fletcher's affidavit in support of the search warrant lacked probable cause and that the warrant was therefore unlawful. Nor does the prosecution contest the circuit court's suppression of the ammunition that the police found while searching the house.

■ Once the circuit court determined that the search warrant was unlawful, it was incumbent upon the prosecution to establish that the firearms were "discovered or became known" to the police by "means sufficiently distinguished" from the prior illegality so "as to purge the [firearms] of the initial taint" caused by the Detective Fletcher's insufficient affidavit. *Fukusaku*, 85 Hawai'i at 475, 946 P.2d at 45. The circuit court concluded that the prosecution had proved that the firearms had become known and were discovered as the result of an "independent source"—to wit, Poaipuni's father—and, as such, were not tainted by the issuance and execution of the defective search warrant.

■ The circuit court was wrong. Assuming, *arguendo*, that Poaipuni's father's voluntarily informed the police that the firearms were located in the tool shed and, moreover, voluntarily consented to the search of the tool shed, the police still would not have been in a position to learn of the firearms or to discover them in the tool shed had not they executed the defective search warrant. Detective Fletcher asserted that he was unaware of the firearms prior to being advised of their presence in the tool shed by Poaipuni's father. Moreover, the record clearly reflects that the police were present at the house for the sole purpose of executing the warrant and not for any "independent" reason, such as being summoned at the request of Poaipuni's father. Thus, the firearms came to light *only* as a result of the exploitation of the previous illegality, *i.e.*, the execution of the defective search warrant. Likewise, the consent of Poaipuni's father to the search of the tool shed cannot purge the taint resulting from the insufficiency of Detective Fletcher's affidavit for the simple reason that the police would not have been in a position to obtain the consent had they not executed the defective warrant. Thus, the consent

---

6. In answering the question, we are mindful that this court has held that the " 'exclusionary rule' does not preclude the use of evidence derived from knowledge of incriminating facts 'gained from an independent source.' " *Lopez*, 78 Hawai'i at 447, 896 P.2d at 903 (quoting *State v. Brighter*, 63 Haw. 95, 100, 621 P.2d 374, 379 (1980)). Thus, "where the independent information is gained prior to the illegal[ity], the resulting evidence is not suppress[ible]." *Id.* (quoting *Brighter*) (brackets and quotation signals omitted). Addressing circumstances under which a search warrant was issued in part on unlawfully obtained information, the *Lopez* court observed that "[u]nder the independent source exception, a 'search warrant is not constitutionally defective because it is based, in part, on illegally seized evidence where sufficient probable cause exists to issue the warrant without relying on the suppressed evidence.' " *Id.* at 447–48, 896 P.2d at 903–04 (quoting *Brighter*). Although we have characterized the independent source doctrine as an "exception" to the exclusionary rule, it is, in essence, simply a corollary of the fruit of the poisonous tree doctrine, as our quotation of *Fukusaku* reflects.

was also tainted by the police's exploitation of the prior illegality.

Accordingly, we hold that the firearms were inadmissible fruit of the poisonous tree and the circuit court erred in denying Poaipuni's motion to suppress them.

### B. *Poaipuni's Statement*

■ "[A] waiver of one's constitutional rights or a confession, even if uncoerced and intelligently given, will be inadmissible if induced by a prior illegality." *Lopez*, 78 Hawai'i at 453, 896 P.2d at 909 (citing *Pauu*, 72 Haw. at 509, 824 P.2d at 835–36 (citing *State v. Knight*, 63 Haw. 90, 94, 621 P.2d 370, 374 (1980), and *State v. Kitashiro*, 48 Haw. 204, 216, 397 P.2d 558, 565 (1964))). Therefore, Poaipuni's purported *Miranda* waiver, which preceded Detective Fletcher's interrogation regarding the firearms could not, *per se*, purge the taint of the prior execution of the unlawful search warrant. Rather, the admissibility of Poaipuni's confession turned on the prosecution proving that it was not induced by the prior illegality, or, more precisely, upon the prosecution proving that it was not obtained as the result of the police exploiting unlawfully obtained evidence or information. *See, e.g., Lopez*, 78 Hawai'i at 453–54, 896 P.2d at 909–10 (holding that defendants, who gave inculpatory statements after being arrested on the basis of, and confronted with evidence obtained as a result of, an unlawful search had been "induced to make [the] inculpatory statements," which were, consequently, inadmissibly tainted fruits of the poisonous tree); *Pauu*, 72 Haw. at 509–12, 824 P.2d at 835–37 (same).

■ In the present matter, the record is devoid of any basis for concluding that, but for the discovery of the firearms, which was tainted by the unlawful search warrant, Detective Fletcher would have questioned Poaipuni regarding them. Detective Fletcher's own testimony that, prior to executing the search warrant, he had been unaware that Poaipuni had possessed the firearms, taken together with the prosecution's failure to adduce any evidence from which a reasonable inference could be drawn that the firearms would have come to light through some alternative and entirely lawful means, is fatal to

the prosecution's introduction of Poaipuni's statement into evidence. As such, Poaipuni's confession that he possessed the firearms constituted tainted fruit of the poisonous tree and was inadmissible at trial. *See Lopez*, 78 Hawai'i at 452–54, 896 P.2d at 908–10; *Pauu*, 72 Haw. at 509–12, 824 P.2d at 835–37.

■ However, Poaipuni did not, at any point during the proceedings in the circuit court, seek to exclude his inculpatory statement as tainted fruit of the unlawful search warrant. Thus, we cannot hold that the circuit court erred, plainly or otherwise, in failing to suppress Poaipuni's statement. *See, e.g., Fukusaku*, 85 Hawai'i at 475, 946 P.2d at 45 (holding that trial court committed no error where defendant "failed to specify what items of derivative evidence he sought to suppress," and, as such, "failed to describe the 'fruit' to which the 'fruit of the poisonous tree' doctrine would be applied"). Recognizing as much, Poaipuni asserts on appeal that his trial counsel was ineffective in not identifying Poaipuni's confession as evidence that derived from the unlawful search warrant and in not arguing that it was inadmissibly tainted fruit of the poisonous tree.

■ To prevail on his ineffective assistance of counsel claim, Poaipuni must establish that his "trial counsel's performance was not objectively reasonable—*i.e.*, [that it was not] 'within the range of competence demanded of attorneys in criminal cases.'" *Briones*, 74 Haw. at 462, 848 P.2d at 976 (quoting *State v. Kahalewai*, 54 Haw. 28, 30, 501 P.2d 977, 979 (1972)). Thus, Poaipuni must, as he does in pointing to his trial counsel's failure to seek suppression of his statement on the ground that it was tainted, point to a specific error or omission that "resulted in either the withdrawal or substantial impairment of a potentially meritorious defense," which includes "the assertion of [the defendant's] constitutional rights." *Id.* (quoting *State v. Antone*, 62 Haw. 346, 349 & n. 1, 615 P.2d 101, 104 & n. 1 (1980)). The defendant raising ineffective assistance of counsel need not, however, prove that the alleged error or omission redounded to his or her " 'actual' prejudice." *Id.* at 464, 848 P.2d

at 977 (citations omitted). Rather, the determination "whether a defense is 'potentially meritorious' requires an evaluation of the possible, rather than the probable, effect of the defense on the decision maker." *Id.*

■ As our foregoing discussion reflects, there is no doubt that Poaipuni's confession was, on the record before the circuit court and before us on appeal, inadmissible at trial. Defense counsel's failure to identify and seek to exclude the confession as inadmissibly tainted evidence that was derived from the unlawful search warrant did not and could not have been calculated to benefit Poaipuni's case. *See, e.g., Pacheco,* 96 Hawai'i at 102, 26 P.3d at 591 (quoting *Dan,* 76 Hawai'i at 427, 879 P.2d at 533, for the proposition that "omissions that have an obvious tactical basis for benefitting the defendant's case will not be subject to further scrutiny") (brackets in the original omitted). Because failing to seek the suppression of Poaipuni's statement on the basis that it was tainted derivative evidence served no purpose that could possibly benefit Poaipuni's case, the record on appeal is sufficiently developed to establish that "there were no legitimate 'tactical' bases upon which defense counsel's omissions could conceivably have been predicated." *Id.* at 102, 26 P.3d at 591. Thus, this is not a case in which Poaipuni's ineffective assistance of counsel claim cannot be decided until the record is further developed in a subsequent post-conviction proceeding. *See id.; cf. Briones,* 74 Haw. at 463, 848 P.2d at 977 (observing that "[i]f the record is unclear or void as to the basis for counsel's actions, counsel shall be given the opportunity to explain his or her actions in an appropriate proceeding").

■ Furthermore, it is clear on the record before us that, in failing to seek suppression of Poaipuni's confession, Poaipuni's trial counsel deprived him of a potentially meritorious assertion of his constitutional rights, insofar as the circuit court was bound by our precedent to suppress the confession and, if it did not, would have committed reversible error. As such, we agree with Poaipuni that his trial counsel's competence fell outside the range demanded of criminal attorneys. *See Pacheco,* 96 Hawai'i at 101–02, 26 P.3d at

590–91 (holding that, where evidence of defendant's prior conviction was inadmissible, defense counsel's failure to object to the prosecution's elicitation of testimony concerning defendant's prior conviction and to the prosecution's subsequent prejudicial remarks with respect thereto constituted ineffective assistance of counsel); *Jones v. State,* 79 Hawai'i 330, 902 P.2d 965 (1995) (observing that the requisite "lack of skill" to establish ineffective assistance of counsel could be satisfied by evidence that trial counsel provided the defendant with erroneous legal advice, for example, by misinforming the defendant as to the types of evidence admissible to impeach him or her).

Accordingly, we hold that Poaipuni's trial counsel provided him with ineffective assistance in failing to seek suppression of Poaipuni's confession on the ground that his inculpatory statement was induced by Detective Fletcher's use of evidence that the latter had obtained as a result of executing the unlawful search warrant, a failure that resulted in the admission of tainted evidence derived from Detective Fletcher's exploitation of a prior illegality.

In sum, we hold that neither the firearms nor Poaipuni's confession were admissible into evidence at trial because both constituted evidence that derived from the exploitation of an unlawful search warrant and, therefore, were tainted by that prior illegality. Accordingly, we hold that the circuit court erred in failing to suppress the firearms and that Poaipuni's trial counsel provided him with ineffective assistance of counsel in failing properly to move to suppress Poaipuni's confession.

## IV. CONCLUSION

In light of the foregoing, we vacate the circuit court's judgment of conviction and sentence and remand this matter to the circuit court for further proceedings consistent with this opinion.

Concurring Opinion of ACOBA, J., with whom LEVINSON, J., joins.

I write separately in response to the dissent's view that there was no *Miranda* vio-

lation in this case. I do not believe that Defendant Appellant Peter Alvin Poaipuni (Defendant) knowingly, intelligently, and voluntarily waived his right against self-incrimination when he made statements to the police regarding the possession of firearms.

## I.

On July 7, 1998, the police arrested Defendant on charges of thefts of automated teller machines (ATMs). While Defendant was in custody, the police executed a search warrant at his residence. Detective Fletcher found several firearms in the toolshed of the property. Detective Fletcher returned to the Wailuku police station and, at 10:10 PM, about twelve hours after Defendant was placed into custody, commenced interrogation of Defendant with Detective Holokai. Detective Holokai informed Defendant that his investigation involved the theft of an ATM from a grocery store in Haʻikāu. Defendant was further told that Detective Ching would later interview Defendant about an investigation involving the Puʻunāenāe Post Office, and Detective Fletcher would thereafter question Defendant about an investigation involving the theft of an ATM machine in Kāihei.

When Defendant agreed to discuss these matters with the police, the police provided Defendant with a written warning and waiver form informing him of his constitutional rights. Detective Holokai and Defendant read over the form together and Defendant initialed and signed the form.

However, in the middle of the interrogation, Detective Fletcher questioned Defendant about firearms discovered at Defendant's residence. There were no firearms involved in the cases assigned to Detectives Holokai, Ching, and Fletcher that had been earlier identified. Detective Holokai testified that there was no mention of guns prior to the commencement of the interrogation. During this discussion of weapons, Defendant gave a statement indicating that he was in possession of firearms, and the police subsequently charged him with the offense of felon in possession of firearms, Hawaiʻi Revised Statutes § 134–7(b) (1993 & Supp.1998).

In a pre-trial hearing, Defendant moved to suppress the incriminating statement. Defendant's motion was denied and the statement was admitted at trial. Defendant was convicted as charged. On appeal, Defendant argues that the court erred when it found that Defendant's statement was knowingly, voluntarily, and intelligently given.

The following testimony of Detective Holokai is crucial to an understanding of whether Defendant knowingly and intelligently waived his right against self-incrimination under the directives of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), as to the charges in the instant case:

Q [PROSECUTOR]: What happened after he finished reading the rights?

A [DETECTIVE HOLOKAI]: When he was through reading the waiver of rights, I asked him if he wanted to give a statement *regarding the investigation,* and [Defendant] stated that he would, and then he signed under the waiver of rights section, and also placed the date and time in this section.

. . . .

Q: Detective Holokai, was there just one case that you were questioning the defendant about?

A: For my case, yes, it was a burglary case.

Q: Okay. And did that involve firearms or what?

A: The firearms case involved a separate case with another detective.

Q: Okay. Would that be Detective Fletcher?

A: Yes, it would.

Q: So during that night, would it be fair to say you and Detective Fletcher were questioning the defendant regarding more than one case that you were investigating or that the police were investigating?

A: Yes.

. . . .

Q [DEFENSE COUNSEL]: ... [I]n fact, there were three of you who were interested in interrogating [Defendant] and you were telling him basically that that was going to be the subject of this

investigation, was not only your investigation, but also Detective Fletcher's and Detective Ching's; correct?

A: Yes, I informed [Defendant] of that. That's correct.

. . . .

Q: *Now, when you said, are you willing to talk to me about this case that I'm going to talk to you about, did he already know what case you were talking about?*

A: *I'm not sure if he did know or not.*

. . .

. . . .

Q: After you said, are you willing to talk to me about this case that I want to talk to you about, and after [Defendant] answered, okay, then you told him, if you are, that is, if you are willing to talk to me about this case, just sign, date and time [sic] on the form?

A: Yes, that's the procedure to have the person sign if they are willing to sign.

Q: *And then you told him, Peter, I'm going to talk to you about the case in Haiku that happened. That was your case; right?*

A: *That's my case, yes sir.*

Q: *This was a case where an ATM machine was taken from a grocery store in Haiku?*

A: *That's a burglary case, yes, sir.*

Q: And then you said—well, in fact, you described it. A burglary at a Haiku General Store, but then you said later on Detective Ching has another case. Detective Ching has another case that he's working on at the Puunene Post Office. I think it's this morning on the 7th of July; right? You told him about that?

A: *Told him Detective Ching wanted to talk to him about his case when I was through with my case.*

Q: *And then you said later on, also Detective Fletcher has a case that he's working on that occurred,* I believe it was July 6th, but in this case, *Detective Fletcher's case, there was an ATM machine pulled out from an establishment in Kihei, so he wanted to talk to you about that case. Okay. And [Defendant] said okay.*

A: *Yes.*

Q: *Then you said, so you are willing to talk to us about these cases tonight, and he said yeah.*

A: *I believe so. . . .*

. . . .

Q: Were you present when the subject then of asking [Defendant] about the guns first came up during this interview?

A: With Detective Fletcher?

Q: Yeah.

A: Yeah, I probably was present, yes.

Q: Okay. *Did the guns that are the subject of this case have any connection with the case that Detective Fletcher was investigating?*

A: The guns—Detective Fletcher's case was the burglary case in Kihei.

Q: That involved taking of an ATM machine; right?

A: Yes.

Q: This was an ATM machine that was taken and fell out the back of the truck during the course of the culprits trying to get away?

A: Yes.

Q: *No indication of any firearms being involved in that case; was there?*

A: *I don't believe so, no.*

Q: *In fact, was there any indication of a firearm being involved in the case that you were investigating, that is the Haiku Grocery Store burglary?*

A: *I did not get any indication from the complainant, no.*

Q: *To your knowledge the case that Mervin Ching [sic], likewise, did not involve firearms; did it?*

A: *I don't think so.*

Q: Up until the point when Detective Fletcher asked [Defendant] about the guns that were found during a search of his house that night, had anybody advised him that he was going to be questioned about that subject?

A: I believe Detective Fletcher probably advised him of the weapons.

Q: When you say you believe he probably did, what does that mean? Does that

mean that, yes, you're testifying under oath that he did, or you think he probably did?

A: Well, If I can follow the transcript I would know for certain, but this happened awhile back, so.

. . . .

Q: *Could you look through that and tell me whether you see any indication of [Defendant] being advised of any investigation involving guns at his house prior to the time he was asked by Detective Fletcher about the guns?*

A: *There's a portion that Detective Fletcher had asked [Defendant] regarding the search at his residence in Pukalani, and Detective Fletcher mentioned something about locating some shotgun shells in one bedroom and that's what he talked to [Defendant] about.*

Q: *To your knowledge were those shotgun shells in any way connected with any of the three investigations that you were discussing with [Defendant] that night?*

A: *Regarding the burglary cases?*

Q: *Yeah.*

A: *No, it's not—it's not connected with those burglaries, no.*

Q: *Okay. And you said there was a place there where Detective Fletcher mentioned the shotgun shells found, and then he proceeds—it's just—that is the beginning of his interrogation when he asked [Defendant] about the firearms found in the tool shed?*

· A: *Yeah, it looks like where Detective Fletcher started the interview with [Defendnat] regarding the items that were found at the house.*

Q: *Up until that time that Detective Fletcher started the interview, there was no previous mention of the firearm; correct?*

A: *Correct.*

(Emphases added.)

The warning of rights and waiver form read to Defendant also reflects he was not informed about the ultimate scope of the interrogation.[1] On the form Defendant initialed that he understood his rights and signed his name under the words "UNDERSTANDING OF RIGHTS" and "WAIVER OF RIGHT." Detective Ching's name is written next to the word "Witness." Detective Holokai's name appears next to the phrase "Warnings given by." As set forth above, Detective Holokai was involved with one of the burglary investigations and Detective Ching with the post office investigation. Detective Fletcher, the person who questioned Defendant regarding the instant case, was apparently investigating the second burglary case. As is evident, the firearms charge was not connected to the burglary cases or to Detective Ching's case.

As a result of the procedure followed, it appears that Defendant could not have known that he was to be asked about the firearms charge at the time he waived his rights. It is plain from the foregoing that, while Defendant was in custody: (1) three detectives interviewed him at the same time about four different cases—the two burglaries, Detective Ching's case, and the instant case; (2) none of the three other cases involved firearms; (3) at the time he was read the *Miranda* warnings and prior to questioning, Defendant was informed that he was

1. The form reads:
### WARNING OF RIGHTS

Before we ask you any questions, we want to tell you about your rights.
You have the right to remain silent.
Anything you say can be used against you in court.
You have the right to talk to a lawyer for advise [sic] before we ask you any questions and to have your lawyer with you during questioning.
If you cannot afford a lawyer one will be appointed for you before any questioning if you wish.

. . . .

### UNDERSTANDING OF RIGHTS
I understand the English language. I have read and heard this statement of my rights and I understand what my rights are.
### WAIVER OF RIGHT
I am willing to make a statement and answer questions without talking to a lawyer or having a lawyer present. No promises or threats have been made to me and no pressure or force of any kind has been used against me. I understand that I have the right to stop answering questions or to ask for a lawyer at any time.

going to be asked about the three other cases; and (4) Defendant was never warned pursuant to *Miranda* that he was to be interrogated about the recovery of firearms from his home.

## II.

The facts in *Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987), differ. In *Spring*, the United States Supreme Court held that "[a] suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his [f]ifth [a]mendment privilege." *Id.* at 577. In that case, federal Alcohol Tobacco & Firearms (ATF) agents, interrogating the defendant about a firearms charge, also questioned him about a murder in Colorado, a crime the defendant denied committing. Subsequently, Colorado law enforcement officials interrogated the defendant, specifically informing him in their *Miranda* warnings that they would question him about the murder. Following the defendant's conviction for that crime, the Colorado Supreme Court affirmed the proposition that the second statement obtained by Colorado officers was the fruit of the poisonous tree of the first statement secured by the ATF agents. Unlike in this case, as to the statement in issue, it was *unclear in Spring as to whether the ATF agents told the defendant about either topic of the interrogation.*

> According to the Colorado Supreme Court, *[i]t is unclear whether Spring was told by the agents that they wanted to question him specifically about the firearms violations for which he was arrested or whether the agents simply began questioning Spring without making any statement concerning the subject matter of the interrogation.* What is clear is that the agents did not tell Spring that they were going to ask him questions about the killing of Walker before Spring made his original decision to waive his *Miranda* rights.

*Id.* at 575 n. 7 (emphasis added) (internal quotation marks and citation omitted). Thus, in *Spring*, it was not established whether the ATF agents informed the defendant of either crime about which they would question him.

However, in the instant case, Detective Holokai informed Defendant that he and the other detectives were going to interview him about three other cases, but then, during the interrogation, Detective Fletcher questioned him about an entirely different matter—the firearms violation—without further *Miranda* warnings. By only advising him that they intended to ask questions about the other cases at the time of the *Miranda* warning, the police did not accurately inform Defendant of the ultimate scope of their interrogation.

## III.

In *State v. Ramones*, 69 Haw. 398, 744 P.2d 514 (1987), this court stated that the "*Miranda* warnings as to one offense provided sufficient notice as to potential criminal liability for the other offense." *Id.* at 405, 744 P.2d at 518. That case is also distinguishable. While interviewing the defendant regarding an "auto theft," the police in *Ramones* determined that the defendant had not stolen the vehicle but had merely committed "the more narrow act of the Unauthorized Control of a Propelled Vehicle [ (UCPV) ][.]" *Id.* at 400, 744 P.2d at 515. As opposed to *Spring*, the question decided was "whether *Miranda* warnings also require the police to apprise criminal suspects of the *specific offense which they might be charged with.*" *Id.* at 404, 744 P.2d at 517 (emphasis added). In *Ramones*, the police did not interview the defendant about *several crimes* but rather about a *single crime.* As the court explained, the *Miranda* warnings form "listed the nature of the charge as 'auto theft' because ... the police *did not know what specific crime* Ramones had committed, so the broader offense of auto theft ... was alleged." *Id.* (emphasis added). The court then explained that

> Ramones was arrested for auto theft but eventually charged with [UCPV]. *The two offenses carry the same penalty and are closely related. Miranda warnings as to one offense provided sufficient notice as to potential criminal liability for the other offense.*

*Id.* at 405, 744 P.2d at 518 (emphasis added). Obviously, the police in *Ramones* interviewed the defendant *about the same act for which he was arrested* and then determined that he should be charged with UCPV rather than "auto theft." Manifestly, the *Miranda* warnings provided "sufficient notice" in *Ramones,* because the interrogation related to only one incident. Here, Defendant was specifically warned as to the burglary incidents and Detective Ching's case, but not as to the firearms charge.

In *Ramones,* this court proposed that "[o]nce *Miranda* warnings are given, they need not be given again in the same interrogation even if other offenses materialize or become more appropriate." 69 Haw. at 406, 744 P.2d at 518 (citing *Spring,* 479 U.S. at 577, 107 S.Ct. 851). In the context of the facts in *Ramones,* this statement appears limited in reach to questioning regarding offenses that materialize as a result of the interrogation, *not out of other investigations being pursued by the police.*

This limitation in *Ramones* is made evident in *State v. Nelson,* 69 Haw. 461, 748 P.2d 365 (1987). In *Nelson,* the defendant was suspected of making harassing phone calls to ministers. He was interrogated on December 25, 1985, after the police read him his *Miranda* rights, and specifically indicated that he did not want the assistance of an attorney. *See id.* at 463, 748 P.2d at 367. Two days later, the police returned to the defendant's home to ask him about other harassing calls made from his telephone. *See id.* He was again read his rights, but this time did not indicate either way on the *Miranda* form whether he wanted an attorney. *See id.*

However, the trial court determined that, on December 27, the defendant had in fact invoked his right to counsel and did not waive it. *See id.* at 465, 748 P.2d at 368. The State argued on appeal that the court should not have suppressed the defendant's statements made on December 27 and thereafter because there was "actually no reason to 'Mirandize' the defendant[,] ... the questioning conducted on December 27th [being] a continuation of the earlier interrogation for

which there was an unequivocal waiver of counsel." *Id.* This court stated:

> To be sure, we recently said[,] "Once Miranda warnings are given, they need not be given again in the same interrogation even if other offenses materialize or become more appropriate." [Ramones], [69 Haw. at 406], 744 P.2d [at] 518 ... (citation omitted). But we were speaking of a situation totally unlike the one at bar....

Unlike Radford John Ramones, Kurt Lance Nelson was subjected to questioning more than once. He was initially questioned by Officer Mariboho on Christmas Day about harassing calls received by two ministers. Armed with information about threatening calls received by other persons uncovered by the telephone company in the interim, Mariboho returned two days later with another officer, and they subjected the defendant to further interrogation. This was hardly "the same interrogation" conducted on Christmas Day. *The officers had new information regarding different offenses, and it was incumbent upon them to "Mirandize" the defendant again.*

*Id.* at 471–72, 748 P.2d at 371–72 (emphases added).

As in *Nelson,* Defendant in the instant case was interrogated about an offense *different* from the offenses about which he was initially warned. These different crimes did not "materialize [as] or become more appropriate" charges as a result of the warning and interrogation. *Id.* Here, the police did not interview Defendant at two separate times. Nevertheless, in my view, they were required to render *Miranda* warnings to Defendant again, and inform him of the new topic of investigation, once they themselves introduced "different offenses" from those about which they had originally informed Defendant in obtaining his *Miranda* waiver.

IV.

In *Ramones,* this court was not faced with facts similar to the instant one and, in that context, whether *Spring* would be persuasive under our own constitution. In my view, a defendant cannot be said to have knowingly and intelligently waived his or her *Miranda*

rights when he or she has been led to believe that the police will only ask questions about a specific incident or incidents but, in the course thereof, the defendant is interrogated about a completely different instance. In such a situation, the defendant, if warned pursuant to *Miranda*, may, upon intelligent and knowing reflection, decline to speak or to proceed without the aid of an attorney. As Justice Marshall's dissent in *Spring* points out, it would appear plain that an accused can only knowingly, intelligently, and voluntarily waive the guarantee against self incrimination if he or she is informed that the guarantee is afforded with respect to the subject focus of interrogation:

> It seems to me self-evident that a suspect's decision to waive [the fifth amendment] privilege will necessarily be influenced by his [or her] awareness of the scope and seriousness of the matters under investigation.

To attempt to minimize the relevance of such information by saying that it "could affect only the wisdom of" the suspect's waiver, as opposed to the validity of that waiver, ventures an inapposite distinction. Wisdom and validity in this context are overlapping concepts, as circumstances relevant to assessing the validity of a waiver may also be highly relevant to its wisdom in any given context. Indeed, the admittedly "critical" piece of advice the Court recognizes today—that the suspect be informed that whatever he [or she] says may be used as evidence against him [or her]— is certainly relevant to the wisdom of any suspect's decision to submit to custodial interrogation without first consulting his [or her] lawyer.

*Spring,* 479 U.S. at 578, 107 S.Ct. 851 (Marshall, J. dissenting, joined by Brennan, J.) (emphasis added) (citation omitted). A suspect cannot intelligently or knowingly exercise his or her *Miranda* rights in one case if, preceding the questioning, the police have led the suspect to believe that they are interviewing him or her about a different crime or crimes:

> Not only is the suspect's awareness of the suspected criminal conduct relevant, its absence may be determinative in a given

case. The State's burden of proving that a suspect's waiver was voluntary, knowing, and intelligent is a "heavy" one. *Miranda,* 384 U.S. at 475, 86 S.Ct. at 1628. We are to " 'indulge every reasonable presumption against waiver' of fundamental constitutional rights" and we shall " 'not presume acquiescence in the loss of fundamental rights.' " *Johnson[v. Zerbst],* 304 U.S. [458,] 464, [58 S.Ct. 1019, 82 L.Ed. 1461] [ (1938) ] (citations omitted); *see Brewer v. Williams,* 430 U.S. 387, [97 S.Ct. 1232, 51 L.Ed.2d 424] (1977).

*Id.* at 581, 107 S.Ct. 851.

Because we do not presume acquiescence in the loss of fundamental rights, *see Tachibana v. State,* 79 Hawai'i 226, 234, 900 P.2d 1293, 1301 (1995); *State v. Dicks,* 57 Haw. 46, 48, 549 P.2d 727, 729 (1976), and are to indulge a reasonable presumption against waiver, *see State v. Vares,* 71 Haw. 617, 621, 801 P.2d 555, 557 (1990); *State v. Dowler,* 80 Hawai'i 246, 250, 909 P.2d 574, 578 (App. 1995), I would hold that Defendant did not waive his *Miranda* rights as to the firearms investigation, and, thus, the use of his statements as to the resulting charge should have been suppressed from use at trial.

Concurring Opinion by MOON, C.J.

I agree with the majority that neither the firearms nor the defendant's statement concerning the firearms were admissible at trial because both constituted evidence derived from the exploitation of an unlawful search warrant and, therefore, were tainted by that prior illegality. I write separately to emphasize my strong belief that, in light of the foregoing disposition, there is no reason to address the issue whether the defendant's Fifth Amendment right against self-incrimination was violated on the alternative ground that the police questioning of him exceeded the scope of his *Miranda* waiver. *See* separate opinion of Acoba, J.

It is well-settled that important questions regarding the interpretation of constitutional provisions should ordinarily be decided only where such decisions are necessary to the resolution of a case. *See State v. Bumanglag,* 63 Haw. 596, 615, 634 P.2d 80, 93 (1981); *Alfapada v. Richardson,* 58 Haw.

276, 278, 567 P.2d 1239, 1241 (1977); *Smith v. Smith,* 56 Haw. 295, 305, 535 P.2d 1109, 1116 (1975); *State v. Marley,* 54 Haw. 450, 457, 509 P.2d 1095, 1101 (1973). We should be reluctant to address constitutional questions when it is not necessary to so do. *See Doe v. Roe,* 67 Haw. 63, 67, 677 P.2d 468, 471 (1984) ("Where cases can be decided on grounds other than on a constitutional basis, this court will find it unnecessary to confront a constitutional question."); *State v. Lo,* 66 Haw. 653, 657, 675 P.2d 754, 757 (1983) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, this court will decide only the latter.") (quoting *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936)) (Brandeis, J., concurring) (internal quotation marks, ellipses points, and brackets omitted); *State v. Tin Yan,* 44 Haw. 370, 383, 355 P.2d 25, 32 (1960) ("Courts generally will not pass upon the constitutionality of a law unless necessary to the determination upon the merits of the cause under consideration."); *Territory v. Gaudia,* 41 Haw. 213, 214–15 (1955) ("[C]ourts will not pass upon the validity of a statute in any case unless it is necessary to a decision of the case so to do.") (internal quotation marks and citations omitted); *cf. State v. Aguinaldo,* 71 Haw. 57, 61–62, 782 P.2d 1225, 1228 (1989) ("A person to whom a statute may be constitutionally applied cannot challenge the statute on the ground that it may conceivably be applied unconstitutionally to others.") (internal quotation marks and citation omitted). The judicious use of our authority and resources demands that we exercise prudence by generally declining to issue opinions unnecessary to the resolution of the case before us. *Cf. In re Mohr,* 97 Hawai'i 1, 10, 32 P.3d 647, 656 (2001) ("the only check upon the judicial branch's exercise of power is its own sense of self-restraint") (internal brackets, quotation marks and citations omitted). Accordingly, I

would decline to address the *Miranda* issue in this case.

Dissenting Opinion by RAMIL, J., with whom NAKAYAMA, J., joins.

I respectfully dissent. First, I would hold that the circuit court was correct in determining that the search of the toolshed was "independent and distinct" from the prior illegal search of the Poaipuni home.[1] Second, I would also hold that Poaipuni's custodial statement was knowingly, voluntarily, and intelligently made pursuant to his *Miranda* rights.

## A.

The exclusionary rule provides that " '[a] subsequent search even under warrant based upon the evidence obtained in the former tainted search is also tainted.' " *State v. Brighter,* 63 Haw. 95, 100, 621 P.2d 374, 379 (1980) (quoting *State v. Boynton,* 58 Haw. 530, 535, 574 P.2d 1330, 1334 (1978)). However, "the exclusionary rule does not preclude the use of evidence derived from knowledge of incriminating facts 'gained from an independent source.' " *Id.* (quoting *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920)). "It is one thing to say that officers shall gain no advantage from violating the individual's rights; it is quite another to declare that such a violation shall put him beyond the law's reach even if his guilt can be proved by evidence that has been obtained lawfully." *Sutton v. United States,* 267 F.2d 271, 271–72 (4th Cir.1959). Accordingly,

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by

---

1. The circuit court concluded in relevant part that:

> 4. Derivative evidence will not be excluded under the fruit of the poisonous tree doctrine if the government learned of the evidence from an independent source, distinct from the illegal

source. *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, [40 S.Ct. 182, 64 L.Ed. 319] (1920). Mr. Poaipuni Sr.'s voluntary consent for the search of his toolshed was independent and distinct from the search warrant executed on his residence.

means sufficiently distinguishable to be purged of the primary taint."

*Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (citation omitted).[2] As an initial matter, a review of the caselaw reveals that this court has never held that an illegal search renders, *per se,* a subsequent consent invalid.

In *Wong Sun,* the United States Supreme Court considered a factual scenario somewhat analogous to the present case. In that case, two defendants were tried together. Narcotics seized from a third party were held inadmissible against one defendant because they were the product of statements made by him at the time of a warrantless and illegal arrest. The Court stated, "We think it clear that the narcotics were 'come at by the exploitation of that illegality' and hence

that they may not be used against [him]." *Id.* at 488, 83 S.Ct. 407. Nonetheless, the same narcotics were found to be admissible against a codefendant. The Court stated,

Our holding, supra, that this ounce of heroin was inadmissible against [the first defendant] does not compel a like result with respect to Wong Sun. The exclusion of the narcotics as to [the first defendant] was required solely by their tainted relationship to information unlawfully obtained from [the first defendant], and not by any official impropriety connected with their surrender by [a third party]." [3]

*Id.* at 491–92, 83 S.Ct. 407.

In the present case, Poaipuni stands in the same position as Wong Sun.[4] The guns were uncovered during a search consented to by a third party, Mr. Poaipuni, Sr.[5] Detective

2. The majority applies the "but for" analysis rejected by *Wong Sun. See* Majority at 389, 49 P.3d at 355 ("We hold that the firearms and Poiaipuni's statement constituted 'fruit of the poisonous tree,' because, but for the exploitation by the police of a prior illegality ... [the evidence would not have come to light].").  First, the majority ignores the clear reasoning in *Wong Sun* that "[w]e need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." *Wong Sun,* 371 U.S. at 487–88, 83 S.Ct. 407. Furthermore, when the majority does frame the question, it does so by stating: "the ultimate question that the fruit of the poisonous tree doctrine poses is as follows: Disregarding the prior illegality, would the police nevertheless have discovered the evidence?" Majority at 393, 49 P.3d at 359. The majority has correctly posed the inevitable discovery exception question. However, there is more than one exception to the exclusionary rule, and the case before us does not raise the question of inevitable discovery, but of independent source. The second error in the majority's "but for" analysis is that the majority wrongfully assumes that there was an "exploitation by the police of a prior illegality." *See* discussion *infra.*

3. The events began when narcotics agents arrested Hom Way, and found heroin in his possession. *Wong Sun,* 371 U.S. at 473, 83 S.Ct. 407. Hom Way, who had not before been an informant, stated that he had bought an ounce of heroin the night before from "Blackie Toy," proprietor of a laundry on Leavenworth Street. *Id.* The agents went to a laundry on Leavenworth Street, operated by James Wah Toy. *Id.* at 473–74, 83 S.Ct. 407. After arresting Toy, one of the agents said to him, "[Hom Way] says he got narcotics from you." *Id.* at 474, 83 S.Ct. 407. Toy responded,

"No, I haven't been selling any narcotics at all. However, I do know somebody who has." *Id.* Toy identified the person as "Johnny," and supplied a description of Johnny's house. *Id.* The agents located the house, and found Johnny Yee. *Id.* at 474–75, 83 S.Ct. 407. After a discussion with the agents, Yee surrendered almost an ounce of heroin. *Id.* Yee later stated that the heroin had been brought to him by Toy and "Sea Dog." *Id.* When Toy was questioned as to the identity of "Sea Dog," he said that "Sea Dog" was Wong Sun. *Id.* The agents then went to Wong Sun's residence and arrested him. *Id.* Both Wong Sun and Toy were charged with transporting and concealing illegally imported heroin. The heroin was held inadmissible against Toy, but admissible against Wong Sun.

4. Notwithstanding the fact that the testimony given before the court was highly conflicting, the court explicitly resolved the conflicts in favor of the prosecution's witness. *See State v. Patterson,* 58 Haw. 462, 469, 571 P.2d 745, 750 (1977). The circuit court found in relevant part: "9. Despite Mr. Poaipuni, Sr.'s testimony which now contradicted the above facts, the Court gives credence to Detective Fletcher's testimony on the above facts." The circuit court's finding that Detective Fletcher's testimony is credible will not be disturbed on appeal. *See State v. Jenkins,* 93 Hawai'i 87, 101, 997 P.2d 13, 27 (2000) (citation omitted).

5. I would affirm the circuit court's finding that Mr. Poiaipuni, Sr. freely, voluntarily, knowingly, and intelligently consented to the search of his toolshed. A search is "reasonable" if conducted in accordance with the voluntary and uncoerced consent of the person whose property is being searched. *State v. Lopez,* 78 Hawai'i 433, 443, 896 P.2d 889, 899 (1995) (citing *State v. Mahone,*

Fletcher reviewed a consent-to-search form with Mr. Poaipuni, Sr. After being carefully and fully advised of his right to withhold consent, Mr. Poiaipuni, Sr. signed the consent-to-search form. *See State v. Patterson,* 58 Haw. 462, 469–70, 571 P.2d 745, 750 (1977). Mr. Poaipuni, Sr. was not under any duress or force of compulsion at the time he consented to the search. *See id.* Accordingly, the search of the toolshed was taken pursuant to a valid third-party consent.

The circumstances leading to Mr. Poaipuni, Sr.'s consent establish that Mr. Poaipuni, Sr. was a source independent of the initial illegal search. The search of the Poiapuni home was part of a criminal investigation into activities of Poaipuni. Although Mr. Poaipuni, Sr. was the owner of the home, until he requested to speak with Detective Fletcher, he was a passive onlooker with respect to the police search. The police had no reason to suspect Mr. Poaipuni, Sr. of any involvement in criminal wrongdoings, nor had the police uncovered evidence implicating Mr. Poaipuni, Sr. in criminal activity. Detective Fletcher was not aware of the toolshed until Mr. Poaipuni, Sr. informed him about it, and was not planning to search for firearms in the toolshed prior to Mr. Poaipuni, Sr.'s disclosure. Mr. Poaipuni, Sr. conceded that, prior to his disclosure, the officers neither inquired about the toolshed or asked him to open the toolshed. Furthermore, Mr. Poaipuni, Sr. knew that Detective Fletcher was not aware of the firearms until Mr. Poaipuni, Sr. himself revealed the information. Mr. Poaipuni, Sr.'s unilateral deci-

sion to interject himself into the investigation, therefore, cannot be said to be the result of the police search.[6]

Furthermore, Mr. Poaipuni, Sr.'s consent was not obtained by exploitation of the illegal search of the Poaipuni home. The officers did not use any knowledge gained from their illegal search of the Poaipuni home. Rather, Mr. Poaipuni, Sr. approached the officers and volunteered the information. Upon being notified about weapons, the officers obtained written consent from Mr. Poaipuni, Sr. before they opened the shed. These factors eviscerate the deterrence rationale for applying the exclusionary rule in this case. *See United States v. Leon,* 468 U.S. 897, 918–19, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

For these reasons, I would hold that the search of the toolshed and items obtained from that search cannot be said to be result of "the exploitation" of the prior illegal search of the Poaipuni home, but rather, they are the product of a waiver independent of the prior illegal search.

## B.

The majority holds that "Poaipuni's purported *Miranda* waiver, which preceded Detective Fletcher's interrogation regarding the firearms could not, *per se,* purge the taint of the prior execution of the unlawful search warrant." Majority at 394, 49 P.3d at 360. My disagreement with the majority's analysis is outlined *supra,* in section A of this dis-

---

67 Haw. 644, 646, 701 P.2d 171, 173 (1985)). "[W]hether consent to search has been given voluntarily is a question of fact to be determined by the trial court from the 'totality of the circumstances.'" *Patterson,* 58 Haw. at 467, 571 P.2d at 748 (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). It is difficult to conclude that, based on the record presented, the findings of fact of the circuit court were "clearly erroneous." *Id.* at 468–69, 571 P.2d at 749 (holding that "the findings of a trier of fact regarding the validity of consent to search must be upheld unless 'clearly erroneous.' ") (citations omitted). The record reveals substantial evidence upon which the circuit court could find that Mr. Poaipuni, Sr.'s consent was in fact voluntarily given. The consent to the search arose from actions taken by Mr. Poaipuni, Sr. Mr. Poaipuni, Sr. requested a private word with the officer in charge, who was

Detective Fletcher. In a private conversation with Detective Fletcher, Mr. Poaipuni, Sr. disclosed the presence of firearms in the toolshed, and expressed a desire to turn the firearms over to the police. Mr. Poaipuni, Sr. led Detective Fletcher to the toolshed and orally authorized the detectives to search therein. Detective Fletcher then explained to Mr. Poaipuni, Sr. that the police required written consent for the search. It appears from the record that if there was any coercion, it came solely from Mr. Poaipuni, Sr.'s subjective fear that he "would have been more in trouble" if the officers found the guns themselves. This is insufficient to demonstrate coercion, or a lack of voluntariness.

6. I make no comment about whether, if evidence had been found incriminating Mr. Poaipuni, Sr., such evidence would be excluded.

sent.[7] As I believe that Poaipuni's confession was not tainted by any prior illegality, I now address Poaipuni's argument regarding the waiver of his *Miranda* rights.

During the pre-trial voluntariness hearing, Poaipuni argued that he waived effectuation of his *Miranda* rights only as to questioning about the ATM theft, and not as to questions about the firearms. He argued that his statements about the firearms were therefore not voluntarily given. I would agree with the circuit court that Poaipuni's custodial statement was knowingly, voluntarily, and intelligently made.

Under both the fifth amendment to the United States Constitution and article I, section 10 of the Hawaiʻi Constitution, "a suspect's awareness of all the possible subjects of the police questioning is not relevant to determine whether the suspect voluntarily, knowingly, and intelligently waived his *Miranda* rights." *Colorado v. Spring,* 479 U.S. 564, 577, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987); *State v. Ramones,* 69 Haw. 398, 403, 744 P.2d 514, 517 (1987). In *Colorado v. Spring,* agents from the Bureau of Alcohol, Tobacco and Firearms (ATF) arrested John Leroy Spring in Missouri for interstate firearms transactions. 479 U.S. at 566, 107 S.Ct. 851. The agents gave Spring his full *Miranda* warnings. Spring also signed a written form stating that he understood and waived his rights. Initially, the agents questioned Spring about his involvement in firearms transactions. The interrogation soon turned to Spring's suspected involvement in a Colorado murder. Spring informed the officers he had "shot another guy once," but gave no further information. Approximately two months later, Colorado law enforcement officials visited Spring in his Kansas City jail cell. After reciting the *Miranda* warnings, the officers obtained a full confession to the Colorado murder. On appeal to the United States Supreme Court, Spring argued that his statement to ATF agents that he had "shot another guy once" was in effect com-

pelled in violation of his fifth amendment privilege because he signed the waiver form without being aware that he would be questioned about the homicide.

The United States Supreme Court rejected Spring's claim, concluding that his argument "strain[ed] the meaning of compulsion past the breaking point." *Id.* at 573, 107 S.Ct. 851. The Court reiterated that *Miranda* warnings serve to "assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." *Id.* at 572, 107 S.Ct. 851 (citing *Miranda v. Arizona,* 384 U.S. 436, 469, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). The Court held that "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." *Id.* at 577, 107 S.Ct. 851. Accordingly, where the totality of the circumstances reveal that a waiver "was the product of a free and deliberate choice rather than intimidation, coercion or deception" and was made "with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it[,]" a court may properly conclude the *Miranda* rights have been waived. *Id.* at 573, 107 S.Ct. 851 (citations omitted). As there was "no doubt" Spring's decision to waive his Miranda rights was both knowing and voluntary, the Court concluded that there was no constitutional impairment.[8] *Id.* at 574, 107 S.Ct. 851.

That same year, this court adopted the *Spring* rule in *Ramones,* 69 Haw. at 398, 744 P.2d at 514. Radford John Ramones was arrested upon suspicion of automobile theft. At the police station, Ramones was given his *Miranda* warnings and executed a Honolulu Police Department waiver of rights document. The form listed the nature of the charge as "auto theft." Ramones was subsequently indicted for the unauthorized control

---

7. Inasmuch as I disagree with the majority's analysis regarding the confession, I also disagree with the majority that trial counsel's failure to move for suppression of Poiaipuni's confession deprived him of a potentially meritorious defense.

8. Recent federal cases applying *Colorado v. Spring* include *Barnes v. Johnson,* 160 F.3d 218, 223 (5th Cir.1998), *United States v. Braxton,* 112 F.3d 777, 784 (4th Cir.1997), and *United States v. Hernandez,* 93 F.3d 1493, 1503 (10th Cir.1996).

of a propelled vehicle. On appeal, Ramones argued that he had not validly waived effectuation of his *Miranda* rights because he did not know the true nature of the charges against him during the interrogation. Holding that the *Miranda* warnings do not require criminal suspects to be notified of the various offenses with which they might be charged prior to custodial interrogation, this court stated: "We agree with the United States Supreme Court's recent decision of *Colorado v. Spring,* ... that a suspect's awareness of all the possible subjects of the police questioning is not relevant to determine whether the suspect voluntarily, knowingly, and intelligently waived his *Miranda* rights." [9] *Ramones,* 69 Haw. at 404, 744 P.2d at 517.

It is nevertheless this court's obligation to "examine the entire record and make an independent determination of the ultimate issue of voluntariness based upon that review and the totality of circumstances surrounding the statement." *State v. Kelekolio,* 74 Haw. 479, 502, 849 P.2d 58, 69 (1993). Our examination requires a twofold analysis: (1) whether Defendant was informed of his rights under the fifth amendment within the context of the custodial interrogation; and, if so, (2) whether Defendant invoked or waived these rights. *State v. Luton,* 83 Hawai'i 443, 452, 927 P.2d 844, 853 (1996).

The record indicates that Poaipuni was adequately informed of his constitutional rights. Detective Holokai gave Poaipuni a warning and waiver form on which Poaipuni's constitutional rights were listed. Detective Holokai read the form to Poaipuni and inquired whether Poaipuni understood each of the rights. Poaipuni indicated that he understood his rights and placed his initials at the

end of each sentence on the form. Poaipuni read the "understanding of rights" section out loud. Finally, he signed and dated the form.

The record also reflects that Poaipuni waived effectuation of his *Miranda* rights and that the waiver was knowing and intelligent. Detective Holokai testified that Poaipuni read the "waiver of rights" portion of the form out loud. The detective then inquired if Poaipuni would give a statement. Poaipuni responded in the affirmative and signed the "waiver" portion of the form. In *State v. Kreps,* the Intermediate Court of Appeals of Hawai'i stated that evidence that a defendant has read and signed a police rights and waiver form can be sufficient basis to establish a valid waiver, provided that the court consider "whether the words used, considering the age, background, and intelligence of the individual impart a clear understandable warning of all his rights." 4 Haw. App. 72, 76–77, 661 P.2d 711, 715 (1983). In this case, the words were plain and unambiguous. The record reveals nothing about Poaipuni's age, background or intelligence that would suggest an inability to understand or effectuate his rights if he desired to do so.

Finally, Poaipuni's statement must have been voluntarily made. *State v. Kekona,* 77 Hawai'i 403, 406, 886 P.2d 740, 743 (1994) (citing *Kreps,* 4 Haw.App. at 77, 661 P.2d at 715). The conditions surrounding the interrogation do not suggest that any impermissible tactics were employed by the detectives to coerce Poaipuni into making a statement. Although Poaipuni had been in custody for approximately twelve hours at the time of the interrogation, the record indicates that Poaipuni was questioned by other detectives

---

9. Hawai'i's adoption of the rule from *Colorado v. Spring* is consistent with the approach adopted by numerous states. *See, e.g., State v. Tibbetts,* 749 N.E.2d 226, 243 (Ohio 2001); *King v. State,* 273 Ga. 258, 539 S.E.2d 783, 790 (2000); *State v. Luke,* 134 Idaho 294, 1 P.3d 795, 798 (2000); *People v. Mahir Ghanin Daoud,* 462 Mich. 621, 614 N.W.2d 152, 162 (2000); *Willey v. State,* 712 N.E.2d 434, 443 (Ind.1999); *People v. Musselwhite,* 17 Cal.4th 1216, 74 Cal.Rptr.2d 212, 954 P.2d 475, 486 (1998); *State v. Sirvio,* 579 N.W.2d 478, 482 (Minn.1998); *State v. Callahan,* 979 S.W.2d 577, 582 (Tenn.1998); *Commonwealth v. Raymond,* 424 Mass. 382, 676 N.E.2d 824, 832 (1997); *State v. Walden,* 183 Ariz. 595, 905 P.2d 974, 989 (1995); *People v. Jordan,* 891 P.2d 1010, 1014 (Colo.1995); *State v. Reed,* 133 N.J. 237, 627 A.2d 630, 649 (1993); *Solis v. State,* 851 P.2d 1296, 1299 (Wyo.1993); *State v. Davis,* 313 Or. 246, 834 P.2d 1008, 1016 n. 9 (1992); *Alston v. State,* 89 Md.App. 178, 597 A.2d 1023, 1025 (Md.1991); *State v. Dixon,* 237 Neb. 630, 467 N.W.2d 397, 408 (1991); *State v. Davis,* 446 N.W.2d 785, 790 (Iowa 1989); *State v. Chisholm,* 565 A.2d 92, 94 (Me.1989); *Herring v. Dugger,* 528 So.2d 1176, 1178 (Fla.1988); *but see State v. Randolph,* 179 W.Va. 546, 370 S.E.2d 741, 743 (1988).

about unrelated investigations during this time.[10] The fact that Detective Fletcher questioned Poaipuni directly upon completing the search of the Poaipuni home further indicates that there was no impermissible motive for the delay. Detective Holokai testified that Poaipuni did not indicate illness, fatigue, hunger or thirst. Detective Holokai likewise testified that he did not threaten Poaipuni and that Poaipuni was cooperative throughout the interrogation.

Accordingly, I would hold that Poaipuni was adequately appraised of his *Miranda* rights and knowingly, voluntarily, and intelligently waived those rights.

## C.

For the foregoing reasons, I would affirm the circuit court's August 11, 1998 judgment of conviction and sentence against Poaipuni for felon in possession of a firearm.

---

10. Detective Holokai had no personal knowledge as to how Poaipuni spent the day prior to the 10:00 p.m. interview. He could not testify as to whether Poaipuni had eaten or slept during the day. However, he was sure that Poaipuni had not spent the whole day inside the interrogation room. Apparently, Poaipuni was questioned by at least one officer in connection with Poaipuni's suspected involvement in a murder. The transcripts also suggest that Poaipuni was questioned with respect to yet another investigation following the questioning by Detectives Holokai and Fletcher.