**Electronically Filed
Supreme Court
SCWC-16-0000797
09-FEB-2021
09:56 AM
Dkt. 11 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

STATE OF HAWAIʻI,
Respondent/Plaintiff-Appellant,

vs

JOSHUA LEE,
Petitioner/Defendant-Appellee.

SCWC-16-0000797

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-16-0000797; CR. NO. 1PC151001959

FEBRUARY 9, 2021

RECKTENWALD, C.J., NAKAYAMA AND McKENNA, JJ.,
AND WILSON J., DISSENTING[1]

OPINION OF THE COURT BY NAKAYAMA, J.

Petitioner/Defendant-Appellee Joshua Lee (Lee) appeals

the judgment of the Intermediate Court of Appeals (ICA) vacating

the Circuit Court of the First Circuit's[2] (circuit court) Order

---

[1]    Associate Justice Richard W. Pollack, who was a member of the court when the oral argument was held, retired from the bench on June 30, 2020.

[2]    The Honorable Rom A. Trader presided.

granting Lee's motion to suppress evidence obtained in a search of Lee's bedroom.  On certiorari, Lee raises a single point of error and argues that the ICA erred in applying an emergency aid exception, which Lee contends is inconsistent with article I, section 7 of the Hawai'i Constitution.

Even if the police officers unlawfully searched Lee's bedroom, however, the circuit court erred in suppressing all evidence obtained by the State.  The evidence did not constitute suppressible "fruit of the poisonous tree."  The State did not gain any benefit from the police officers' entry into Lee's bedroom.  Moreover, Lee's actions following the officers' entry into Lee's bedroom severed any causal link between the officers' purportedly unlawful entry and the evidence recovered. Therefore, the ICA did not err in vacating the Order entered by the circuit court on October 13, 2016, and we affirm the ICA's Judgment on Appeal on different grounds.

## I.   Background

### A.   Factual Background

On October 26, 2015, Honolulu Police Department (HPD) dispatched Corporal Craig[3] Takahashi (Corporal Takahashi),

---

[3]     The record identifies Corporal Takahashi as both "Kurt Takahashi" and "Craig Takahashi."  This court will use the given name Corporal Takahashi provided in his own testimony.

Officer Sommer[4] Kahao (Officer Kahao), and Sergeant Michael Cobb (Sergeant Cobb) (collectively, the officers) to respond to a "suicidal male call" at a home in 'Aiea.  The dispatcher informed the officers that Lee had locked himself in his bedroom, where he kept samurai swords, and was threatening suicide.

After the officers entered the home with Lee's family's consent, the officers attempted to persuade Lee to open the door so that they could visually confirm that Lee was unharmed, as required by HPD training.  Officer Kahao spoke with Lee first, using phrases like "Joshua, this is Officer Kahao, Could you please open the door?"  Instead of opening the door, Lee responded that he was okay and that the officers should leave.  After Officer Kahao spoke with Lee for approximately ten minutes, Sergeant Cobb took over speaking with Lee.  The circuit court found that "Sergeant Cobb was more demanding" and told Lee that he "needed to grow up" and "to be a man."  When Lee asked if the officers had a warrant, Sergeant Cobb responded, "We don't need a warrant, dumbass."[5]

Despite Lee's requests that the officers leave, the officers were required to ensure that Lee was neither harmed nor

---

[4]    The record identifies Officer Kahao as both "Sommer Kahao" and "Summer Kahao."  This court will use the spelling utilized in the indictment.

[5]    Sergeant Cobb testified that using aggressive language in response to suicide calls is permitted by HPD training.  This court expresses no opinion on the propriety of Sergeant Cobb's methods.

at imminent risk of injuring himself. Sergeant Cobb therefore picked the lock on the door so that the officers could at least see Lee. However, Sergeant Cobb could not open the door because it was being obstructed.

Once the door opened, however, the situation rapidly changed. Lee opened the door approximately four to six inches. From the hallway, the officers saw Lee holding a sword handle in his right hand. Based on the officers' positioning, Sergeant Cobb could only see the sword handle. However, Officer Kahao and Corporal Takahashi both saw that the sword was made of wood. Officer Kahao instructed Lee to drop the sword, but Lee did not immediately comply.

Concerned for the officers' safety, Sergeant Cobb pushed open the door and entered the room, simultaneously pushing Lee away from the officers. Once Sergeant Cobb was inside the room, Lee swung the sword at Sergeant Cobb, but missed. Sergeant Cobb attempted to calm Lee down, but Lee maintained an aggressive stance. Sergeant Cobb tried to grab Lee's arm. However, Lee flipped Sergeant Cobb onto Sergeant Cobb's back. Lee then started kneeing Sergeant Cobb in the head. From the time Lee opened the door to the time Lee flipped Sergeant Cobb over, mere seconds had passed.

After seeing Sergeant Cobb suddenly flip over, Officer Kahao attempted to grab Lee from behind. However, Lee threw

Officer Kahao onto a couch in the room.  Officer Kahao and

Corporal Takahashi ultimately subdued Lee using pepper spray.

A grand jury indicted Lee with Terroristic Threatening

in the First Degree,[6] Assault Against a Law Enforcement Officer

in the First Degree,[7] and Resisting Arrest.[8]

---

[6]    Hawai'i Revised Statutes (HRS) § 707-716(1) (2013) provides in relevant part

> Terroristic threatening in the first degree.  (1) A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening:
>
> . . .
>
> (c)  Against a public servant arising out of the performance of the public servant's official duties. . . .
>
> . . .
>
> (e)  With the use of a dangerous instrument or a simulated firearm. . . .

[7]    HRS § 707-712.5(1)(a) (2003) provides

> Assault against a law enforcement officer in the first degree.  (1) A person commits the offense of assault against a law enforcement officer in the first degree if the person:
>
> (a)  Intentionally or knowingly causes bodily injury to a law enforcement officer who is engaged in the performance of duty[.]

[8]    HRS § 710-1026(1)(a) (2001) provides

> Resisting arrest. (1) A person commits the offense of resisting arrest if the person intentionally prevents a law enforcement officer acting under color of the law enforcement officer's official authority from effecting an arrest by:
>
> (a)  Using or threatening to use physical force against the law enforcement officer or another[.]

## B. Circuit Court Proceedings

Lee moved the circuit court to suppress all evidence gathered from Lee's bedroom, all statements made to the officers after they entered Lee's room, and "all actions initiated by illegal observations made by HPD Officers." Lee asserted that he possessed a reasonable expectation of privacy in his bedroom and that any evidence of his actions was obtained from a warrantless search.

The circuit court granted Lee's motion. In particular, the circuit court determined that Lee possessed a reasonable expectation of privacy in his bedroom, that Sergeant Cobb coerced Lee into opening his bedroom door, and that "all statements, evidence, observations and actions that were observed or obtained" after entry into Lee's bedroom should be suppressed.

## C. ICA Proceedings

The State appealed to the ICA, arguing that the circuit court erred in granting Lee's motion to suppress because (1) the exigent circumstances exception applied, (2) the federal emergency aid exception applied, and (3) alternatively, if the officers unlawfully entered Lee's room, Lee's actions were not protected as they constituted a new crime.

The ICA agreed with the State's claim that an emergency aid exception applied. Notably, the ICA determined

that a warrantless search occurred when Lee opened his bedroom door.  Nevertheless, the ICA held that the search was reasonable because an emergency aid exception justified the warrantless search, and the circuit court therefore erred in granting Lee's motion to suppress.

## II.  Standard of Review

### A.  Motion to Suppress

"[W]e review questions of constitutional law under the 'right/wrong' standard."  State v. Jenkins, 93 Hawaiʻi 87, 100, 997 P.2d 13, 26 (2000) (citing State v. Toyomura, 80 Hawaiʻi 8, 15, 904 P.2d 893, 900 (1995)).  Accordingly, "[w]e review the circuit court's ruling on a motion to suppress de novo to determine whether the ruling was 'right' or 'wrong.'"  State v. Kauhi, 86 Hawaiʻi 195, 197, 948 P.2d 1036, 1038 (1997) (citing State v. Navas, 81 Hawaiʻi 113, 123, 913 P.2d 39, 49 (1996)).

## III. Discussion

On certiorari, Lee argues that the ICA erred in vacating the circuit court's order granting Lee's motion to suppress evidence.  Specifically, Lee contends that "the State . . . failed to establish exigent circumstances to justify the warrantless search."  Lee adds that the ICA improperly relied upon the federal emergency aid exception because it "is inconsistent with the enhanced protections afforded under Article I, Section 7" of the Hawaiʻi Constitution.

We accepted certiorari in this case to reinforce our precedent regarding the exclusionary rule and the fruit of the poisonous tree doctrine. Assuming that the officers' entry into Lee's bedroom was unlawful, the State bore the burden of showing that the evidence gathered was not tainted by their unlawful entry. The State satisfied this burden. The officers did not receive any benefit from entering Lee's bedroom. Additionally, Lee's decision to assault the officers constituted an intervening circumstance which dissipated the causal link between the officers' entry and the evidence gathered. Because the evidence at issue did not constitute fruit of the poisonous tree regardless of the legality of the officers' entry, we do not address the issue of whether the emergency aid exception justified the officers' entry.

A.   **The Exclusionary Rule and the Fruit of the Poisonous Tree Doctrine.**

The Hawai'i exclusionary rule serves the dual purposes "of deterring governmental officials from circumventing the protections afforded by the Hawai'i Constitution" and of "protect[ing] the privacy rights of our citizens." State v. Lopez, 78 Hawai'i 433, 446, 896 P.2d 889, 902 (1995) (citing State v. Furuyama, 64 Haw. 109, 122, 637 P.2d 1095, 1104 (1981)). Relatedly, "the 'fruit of the poisonous tree' doctrine 'prohibits the use of evidence at trial which comes to light as

a result of the exploitation of a previous illegal act of the police.'" State v. Fukusaku, 85 Hawaiʻi 462, 475, 946 P.2d 32, 45 (1997).

**B.     The circuit court erred in granting Lee's motion to suppress because there was no fruit of the poisonous tree.**

Under the federal constitution, in order to prevent evidence from being suppressed as "fruit of the poisonous tree," the prosecution must "show that its evidence is untainted" by the government's purportedly unlawful act. Id. The State may achieve this goal either by showing that the police did not exploit the illegal activity to gather evidence, id., or by demonstrating that there is no causal link between the illegal activity and the evidence gathered, Wong Sun v. United States, 371 U.S. 471, 488, 83 S. Ct. 407, 417 (1963). We have adopted a similar formulation under the state constitution:

> "[T]he 'fruit of the poisonous tree' doctrine 'prohibits the use of evidence at trial which comes to light as a result of the exploitation of a previous illegal act of the police.'" State v. Fukusaku, 85 Hawaiʻi 462, 475, 946 P.2d 32, 45 (1997) (quoting State v. Medeiros, 4 Haw. App. 248, 251 n.4, 665 P.2d 181, 184 n.4 (1983)). "Under the fruit of the poisonous tree doctrine, [a]dmissibility is determined by ascertaining whether the evidence objected to as being 'fruit' was discovered or became known by the exploitation of the prior illegality or by other means sufficiently distinguished as to purge the later evidence of the initial taint." State v. Poaipuni, 98 Hawaiʻi 387, 392–93, 49 P.3d 353, 358–59 (2002) (alteration in original) (quoting Fukusaku, 85 Hawaiʻi at 475, 946 P.2d at 45).

State v. Trinque, 140 Hawaiʻi 269, 281, 400 P.3d 470, 482 (2017).

Here, both exceptions to the "fruit of the poisonous tree" doctrine apply.

9

1.   **The State did not obtain any benefit from opening Lee's bedroom door.**

As previously stated, one of the purposes of the Hawai'i exclusionary rule is to deter the circumvention of the Hawai'i Constitution's protections.  <u>Lopez</u>, 78 Hawai'i at 446, 896 P.2d at 902.  Thus, this court has explained that evidence may be excluded where "the State [is] unable to meet its burden of showing that the discovery of the challenged evidence was not a <u>benefit</u> derived from the prior illegality."  <u>Trinque</u>, 140 Hawai'i at 282, 400 P.3d at 483 (emphasis added).

Opening Lee's bedroom door did not confer any benefit upon the officers or the State.  Notably, the officers were not summoned to Lee's home for the purpose of conducting a criminal investigation.  Rather, the officers were responding to a "suicidal male call."  Assuming <u>arguendo</u> that the officers unlawfully opened Lee's bedroom door, they did not do so for the purpose of gathering evidence, but to administer care.  The officers did not gain any benefit from opening Lee's bedroom door or exploit that illegal entry to procure the relevant evidence – their observations of Lee's actions – because the entry did not lead the officers to search for that evidence nor direct any investigation into its discovery.  Consequently, any evidence obtained cannot be suppressed on the basis that the

State derived a benefit from the prior illegality.  See Trinque,
140 Hawaiʻi at 282, 400 P.3d at 483.

### 2. Lee's independent actions purged any potential taint from the officers' allegedly unlawful entry.

In addition to the fact that the police did not derive
any benefit from opening Lee's bedroom door, Lee's independent
actions purged any taint from the officers' entry.  In its brief
before the ICA, the State argued that the exclusionary rule does
not exclude "testimony describing [Lee's] own illegal actions
following an unlawful search and seizure."  We agree.

The State primarily relied upon United States v.
Waupekenay, 973 F.2d 1533 (10th Cir. 1992), to assert that Lee
had no reasonable expectation of privacy once the officers
entered his bedroom, and thus, evidence of Lee's actions did not
constitute fruit of the poisonous tree.  In Waupekenay, the
United States Court of Appeals for the Tenth Circuit noted that
state and federal courts have relied upon three rationales for
allowing prosecutors to utilize evidence of new crimes committed
by defendants after illegal government intrusions.  Id. at 1537-
38.  First, some courts have held, as the Tenth Circuit did in
Waupekenay, that defendants "could not have had a reasonable
expectation of privacy for any actions initiated subsequently to
[the government agents' unlawful entry] in their presence."  Id.
at 1537.  Second, a number of courts have instead held that "the

11

intervening act of the defendant [is] so separate and distinct from the illegal entry or arrest as to break the causal chain." Id. at 1538. Third, other courts have focused on "the limited objective of the exclusionary rule . . . and the strong public interest in preventing and punishing force or threats of force directed against police officers." Id.

The Tenth Circuit explained that "[t]he rationale that is most applicable depends upon the underlying facts of the encounter." Id. However, the Tenth Circuit noted, "whatever rationale is used, the result is the same: Evidence of a separate, independent crime initiated against police officers in their presence after an illegal entry or arrest will not be suppressed under the Fourth Amendment." Id. at 1538.

Although we disagree with the Tenth Circuit's determination regarding a defendant's expectation of privacy, we agree that evidence of a separate, independent crime after an illegal entry will not be suppressed under either the Fourth Amendment of the United States Constitution or article I, section 7 of the Hawai'i Constitution. By the Waupekenay court's logic, a defendant would lack a reasonable expectation of privacy in a home for any action initiated in the presence of government agents after the government agents unlawfully entered the home. See id. at 1537. Such an exception would swallow the rule. Neither the Fourth Amendment of the United States

Constitution nor article I, section 7 of the Hawai'i Constitution would deter government intrusions into the privacy of an individual's home so long as government agents could conceivably identify a newly initiated action following an illegal entry.

The Waupekenay court attempted to rectify this issue by explaining that the individual would still have an expectation of privacy in any pre-existing activities as well as any acts that are "extension[s] of the previously initiated illegal activity." Id.[9] However, this leads to a questionable exercise in line drawing between pre-existing and newly initiated activities. Notably, the Waupekenay court provided, as an example, that if an individual was cultivating marijuana in his living room prior to the unlawful government intrusion, the police would not be allowed seize the pre-existing contraband. Id. The Waupekenay court added that "an effort to dispose of preexisting contraband following an illegal entry does not validate the seizure of the contraband because the disposal effort is viewed not as a new or independent criminal act but rather as an extension of the previously initiated illegal activity." Id. On the one hand, the disposal of the

_____

[9] The Tenth Circuit appears to base this reasoning on the United States Court of Appeals for the Eleventh Circuit's articulation of a "new crime" exception. See United States v. Bailey, 691 F.2d 1009 (11th Cir. 1982). However, as discussed infra, this is problematic because it is not necessarily clear where the line between a pre-existing crime and a new crime should be drawn.

evidence of a previous crime is inextricably linked to the previous crime itself, and could therefore be considered an extension of the past criminal activity.  However, it is not clear why such a connection alone neutralizes the fact that disposal of evidence is a distinct crime.  Compare 21 U.S.C. § 841(a)(1) (making it unlawful to knowingly or intentionally manufacture, distribute, or dispense, possess with the intent to manufacture, distribute, or dispense, a controlled substance), with 18 U.S.C. § 2232(a) (criminalizing the "[d]estruction or removal of property to prevent seizure").  Thus, we disagree with the Tenth Circuit's reasoning that an individual lacks a reasonable expectation of privacy for actions initiated in the presence of police officers who unlawfully entered the individual's home.

Instead, this court finds persuasive our sister courts' reasoning that defendants' subsequent criminal acts, committed of their own free will, sever the causal link between the illegal entry and the evidence.  See, e.g., State v. Saavedra, 396 N.W.2d 304, 305 (N.D. 1986); State v. Bale, 267 N.W.2d 730, 732-33 (Minn. 1978); People v. Townes, 359 N.E.2d 402, 406 (N.Y. 1976).  The causal connection between the State's unlawful activity and the discovery of the challenged evidence obtained "may . . . become so attenuated as to dissipate the taint."  Nardone v. United States, 308 U.S. 338, 341, 60 S. Ct.

266, 268 (1939). Thus, "the more apt question [here] is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at . . . by means sufficiently distinguishable to be purged of the primary taint.'" Wong Sun, 371 U.S. at 488, 83 S. Ct. at 417 (quoting Maguire, Evidence of Guilt, 221 (1959)).

The Minnesota Supreme Court has posited that "[n]umerous factors bear on the application of this test, including the temporal proximity of the illegality and the fruit of that illegality, the presence of intervening circumstances, and the purpose and flagrancy of the physical misconduct." Bale, 267 N.W.2d at 733. The Bale court emphasized that the "last factor is especially important, because the aim of the exclusionary rule is to deter police misconduct by removing the incentive to disregard constitutional guarantees." Id. We agree.

The factors identified by the Bale court militate against granting Lee's motion to suppress. Based on the record before this court, Lee committed two intervening acts that severed the causal chain between the officers' entry and the resulting evidence. First, after speaking with the officers through his bedroom door for approximately twenty minutes, Lee

15

opened his bedroom door while holding a wooden sword in a threatening manner.[10]  Second, once the officers entered the room, Lee attempted to strike Sergeant Cobb with the sword. Each of these acts was sufficient to transform the welfare check into an exigent circumstance.

Furthermore, the officers merely sought to ensure that Lee was unharmed, and therefore had no interest in gathering evidence to support a criminal investigation.  See also Bale, 267 N.W.2d at 733 ("More important is the fact that no intent to secure evidence motivated the decision to custodially arrest defendant on the misdemeanor charge.").  Consequently, any evidence obtained by the State was collected "by means sufficiently distinguishable to be purged of the primary taint," Wong Sun, 371 U.S. at 488, 83 S. Ct. at 417, because any search of Lee's room was neither purposeful nor sufficiently flagrant to merit suppressing the evidence found, see Bale, 267 N.W.2d at 733.

---

[10]    The Dissent asserts that the officers should have left once Lee's brother withdrew his consent for the officers to be in the home.  Assuming Lee's brother actually withdrew his consent, the withdrawal was legally irrelevant because Lee had already committed an intervening act.

The Dissent also argues that there is evidence in the record that this "was not actually an intervening act because Lee was not holding the wooden sword in a threatening manner."  Respectfully, no such evidence appears in the record.  At the time Lee opened his door, Lee's brother was sitting in the dining room.  Lee's brother did not testify that he could see into the room from where he sat.  Instead, Lee's brother testified that he only saw Lee after the officers had entered Lee's room.

## IV.  Conclusion

For the foregoing reasons, the circuit court erred in suppressing the evidence of Lee's intervening and independent assault against the officers.  Crucially, this opinion does not legalize the State's intrusion into the privacy of an individual's bedroom.  Rather, it merely allows the State to offer evidence resulting from a person's own unlawful actions following the entry.  Because the evidence should not have been suppressed even if the officers unlawfully entered Lee's bedroom, we do not address the issue of whether an emergency aid exception justified the search.  We therefore affirm the ICA's July 2, 2019 Judgment on Appeal on different grounds.

| | |
|---|---|
| Alen M. Kaneshiro<br>for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Stephen K. Tsushima<br>for respondent | /s/ Sabrina S. McKenna |

