**Electronically Filed
Intermediate Court of Appeals
CAAP-17-0000922
10-JUN-2021
08:10 AM
Dkt. 61 OP**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

---o0o---

IN THE MATTER OF JK

NO. CAAP-17-0000922

APPEAL FROM THE FAMILY COURT OF THE THIRD CIRCUIT
(CASE NO. FC-M NO. 17-1-041K)

JUNE 10, 2021

GINOZA, CHIEF JUDGE, HIRAOKA AND NAKASONE, JJ.

OPINION OF THE COURT BY HIRAOKA, J.

"[C]ivil commitment of the mentally ill for any purpose constitutes a significant deprivation of liberty that requires due process protection." In re Doe, 102 Hawaiʻi 528, 543, 78 P.3d 341, 356 (App. 2003) (cleaned up) (quoting Addington v. Texas, 441 U.S. 418, 425 (1979)). In this case, Respondent-Appellant **JK** was involuntarily hospitalized under Hawaii Revised Statutes (**HRS**) Chapter 334. He appeals from the "Order Granting Petition for Involuntary Hospitalization" entered by the Family

Court of the Third Circuit on December 14, 2017.[1]  For the reasons explained below we hold: **(1)** we have jurisdiction to decide JK's appeal under the collateral consequences exception to the mootness doctrine; and **(2)** the family court erred when it found there was clear and convincing evidence that JK was imminently dangerous to himself or others within the meaning of HRS §§ 334-1 and 334-60.2.  Accordingly, we reverse the Order Granting Petition for Involuntary Hospitalization.

## BACKGROUND

On November 21, 2017, JK was examined by Michael McGrath, M.D. (**Dr. McGrath**), in the emergency room of the Kona Community **Hospital**.  Dr. McGrath was the attending psychiatrist at the Hospital's Kalani Ola Behavioral Health Unit.   JK's family had reported "bizarre and disorganized behavior, . . . decreased sleep, pressured speech, . . . some paranoid thinking, some grandiose thinking, some poor judgment, some potentially dangerous behaviors that led them to bring [JK] to the emergency department."

Dr. McGrath obtained a history from JK and developed a working diagnosis of bipolar disorder, manic.  Dr. McGrath's Certificate of Physician/Psychologist for Involuntary Hospitalization (**Certificate**) was dated November 23, 2017, and stated that JK was imminently and substantially dangerous to other persons (not to himself) and that "family is frightened because of impulsive, unpredictable behavior[.]"  Dr. McGrath

---

[1]     The Honorable Aley K. Auna, Jr. presided.

certified that JK was not capable of realizing he needed treatment or of making a rational decision about his treatment. Dr. McGrath had JK involuntarily admitted to the Hospital.

**PROCEDURAL HISTORY**

On November 24, 2017, the **State** of Hawaiʻi Department of Health filed a petition to involuntarily hospitalize JK under HRS Chapter 334. HRS § 334-60.2 (Supp. 2016) provides:

> **§ 334-60.2 Involuntary hospitalization criteria.** A person may be committed to a psychiatric facility for involuntary hospitalization, if the court finds:
>
> (1) That the person is mentally ill or suffering from substance abuse;
>
> (2) That the person is imminently dangerous to self or others; and
>
> (3) That the person is in need of care or treatment, or both, and there is no suitable alternative available through existing facilities and programs which would be less restrictive than hospitalization.

The first statutory criterion must be established "beyond a reasonable doubt[,]" while the second and third criteria must be established by "clear and convincing evidence[.]" HRS § 334-60.5(j) (Supp. 2016); see In re Doe, 102 Hawaiʻi 528, 529, 78 P.3d 341, 342 (App. 2003).

The following definitions apply:

> "Dangerous to others" means likely to do substantial physical or emotional injury on another, **as evidenced by a recent act, attempt or threat.**
>
> . . . .
>
> "Dangerous to self" means the person recently has:
>
> (1) **Threatened or attempted suicide or serious bodily harm**; or
>
> (2) Behaved in such a manner as to indicate that the person is unable, without supervision and the

3

> assistance of others, to satisfy the need for nourishment, essential medical care, shelter or self-protection, so that **it is probable that death, substantial bodily injury, or serious physical debilitation or disease will result unless adequate treatment is afforded**.
>
> . . . .
>
> "Imminently dangerous to self or others" means that, without intervention, the person will likely become dangerous to self or dangerous to others **within the next forty-five days**.

HRS § 334-1 (2010 & Supp. 2016) (emphasis added).

The State's petition was supported by Dr. McGrath's Certificate. The petition was heard on November 30, 2017. The family court received testimony from Dr. McGrath and JK's spouse. The family court then ruled:

> Um, the Court finds beyond a reasonable doubt that [JK] is mentally ill. Uh, his diagnosis is bipolar disorder manic. There -- the doctor provided and [JK's spouse] supported a number of incidences [sic] of, uh, paranoid or grandiose behavior, uh, with delusions, uh, that supports that diagnosis. Uh, even while at the hospital he was argumentative and could not adequately communicate.
>
> Uh, the Court further finds that, um, [JK] needs care and/or treatment and there is no suitable alternative available which would be less restrictive than hospitalization; uh, to wit, uh, [JK] has stated in very certain terms that he's not gonna take any medication and, uh, at least with regards to [JK's spouse], uh, he would not listen to her.
>
> What is very telling here is that [JK] prior to him being at the hospital had no or very little sleep and, uh, that is quite concerning to the Court. The -- and while at the hospital and taking at least some of the medication, uh, evidence has shown that he is sleep -- he is sleeping which is a good thing.
>
> Uh, but if [JK] follows through with what he stated to others that he's gonna refuse taking medication when he gets out, uh, the Court can surmise that he will revert back to very little or no sleeping at all which is very concerning to the Court.
>
> Uh, the Court agrees with [JK], uh, there's been no evidence presented that, uh, anything that was done with the straight razor, uh, was harmful or dangerous to anyone. Uh, he -- there's no indication that he used it to threaten someone with, uh, or that he actually cut someone or himself

> with it.  Uh, he was simply trying to teach his son how to shave.
>
> . . . .
>
> So the Court can conclude based upon prior action, uh, that, uh, if [JK] continues to not have any or sufficient sleep and nourishment, he's taking Power Bars and nothing else, uh, that if he doesn't have essential medical care, uh, that there is a probability that death or substantial bodily injury or serious physical debilitation will result unless adequate treatment is afforded to him.
>
> So the Court will find that the State has proven by clear and convincing evidence that [JK] is imminently dangerous to himself and others and that he needs care and/or treatment and there is no suitable alternative available which would be less restrictive than hospitalization.
>
> . . . [T]he petition is granted.

The Order Granting Petition for Involuntary Hospitalization was entered on December 14, 2017.  This appeal followed.

## JURISDICTION

The State contends JK's appeal is moot because the period of his involuntary hospitalization has expired and he is no longer involuntarily hospitalized.  "[M]ootness is an issue of subject matter jurisdiction."  Hamilton ex rel. Lethem v. Lethem, 119 Hawaiʻi 1, 4, 193 P.3d 839, 842 (2008).  Accordingly, before we reach the merits we must analyze whether we have jurisdiction to decide this appeal.  Pele Def. Fund v. Puna Geothermal Venture, 77 Hawaiʻi 64, 67, 881 P.2d 1210, 1213 (1994) ("[E]very court must . . . determine as a threshold matter whether it has jurisdiction to decide the issue presented.") (citation omitted).

> The mootness doctrine is said to encompass the circumstances that destroy the justiciability of a suit previously suit-able for determination.  Put another way, the suit must remain alive throughout the course of litigation to the moment of final appellate disposition.  Its chief purpose is to assure that the adversary system, once set in operation, remains properly fueled.  The doctrine seems appropriate

> where events subsequent to the judgment of the trial court
> have so affected the relations between the parties that the
> two conditions for justiciability relevant on appeal —
> adverse interest and effective remedy — have been
> compromised.

Hamilton, 119 Hawaiʻi at 5, 193 P.3d at 843 (quoting Lathrop v. Sakatani, 111 Hawaiʻi 307, 312-13, 141 P.3d 480, 485-86 (2006)) (other citation omitted).

JK contends that the "collateral consequences" exception to the mootness doctrine applies.

> To invoke successfully the collateral consequences doctrine,
> the litigant *must show that there is a **reasonable
> possibility** that prejudicial collateral consequences will
> occur. Accordingly, the litigant must establish these
> consequences by more than mere conjecture, but need not
> demonstrate that these consequences are more probable than
> not.* This standard provides the necessary limitations on
> justiciability underlying the mootness doctrine itself.
> Where there is no direct practical relief available from the
> reversal of the judgment, as in this case, the collateral
> consequences doctrine acts as a surrogate, calling for a
> determination whether a decision in the case can afford the
> litigant some practical relief in the future.
>
> The array of collateral consequences that will preclude
> dismissal on mootness grounds is diverse, and includes harm
> to a defendant's reputation as a result of the judgment at
> issue.

Hamilton, 119 Hawaiʻi at 8, 193 P.3d at 846 (quoting Putman v. Kennedy, 900 A.2d 1256, 1261-62 (Conn. 2006)).

JK does not cite, nor have we found, any reported Hawaiʻi appellate decision identifying reasonably possible prejudicial collateral consequences of an order for involuntary hospitalization. In In re PC, No. CAAP-15-0000015, 2017 WL 2602003 (Haw. App. June 15, 2017) (SDO), we applied the collateral consequences doctrine to an appeal from an involuntary hospitalization but we did not identify what prejudicial collateral consequences were reasonably possible. Id. at *1 n.2.

In <u>Hamilton</u>, the supreme court recognized that "reputational harm" was sufficient to trigger application of the collateral consequence exception.  119 Hawaiʻi at 9-11, 193 P.3d at 847-49.  Like the temporary restraining order at issue in <u>Hamilton</u>, there is a reasonable possibility that the family court's findings — that JK was mentally ill and imminently dangerous to himself and others — and order of involuntary hospitalization will cause harm to JK's reputation.  We hold that the reputational harm that could reasonably result from an order of involuntary hospitalization under HRS § 334-60.2 is sufficient to trigger the collateral consequences exception to the mootness doctrine.  We have jurisdiction to decide the merits of JK's appeal.

## POINTS OF ERROR

JK argues that the family court: **(1)** "committed plain error, and violated [JK]'s constitutional right to a hearing before a fair and impartial tribunal by its adversarial questioning, and improper elicitation of evidence upon which the family court specifically based its findings"; **(2)** "erred in concluding that the State proved beyond a reasonable doubt that [JK] is mentally ill"; and **(3)** "erred in concluding that there was clear and convincing evidence that [JK] was imminently dangerous to self or others."

**STANDARDS OF REVIEW**

**Constitutional Law**

Questions of constitutional law are reviewed under the "right/wrong" standard. State v. Lee, 149 Hawaiʻi 45, 49, 481 P.3d 52, 56 (2021).

**Judicial Questioning of a Witness**

"A trial judge's questioning of a witness is reviewed on appeal for abuse of discretion." State v. Sprattling, 99 Hawaiʻi 312, 317, 55 P.3d 276, 281 (2002) (citations omitted). In this case, JK did not object to the family court questioning or calling witnesses; accordingly, we review for plain error. The Hawaiʻi Supreme Court has stated:

> [T]he plain error doctrine represents a departure from the normal rules of waiver that govern appellate review, and, as such, . . . an appellate court should invoke the plain error doctrine in civil cases only when justice so requires[.] As such, the appellate court's discretion to address plain error is always to be exercised sparingly.

Okada Trucking Co. v. Bd. of Water Supply, 97 Hawaiʻi 450, 458, 40 P.3d 73, 81 (2002) (cleaned up).

**Findings of Fact and Conclusions of Law**

A trial court's label of a finding of fact or a conclusion of law is not determinative of the standard of review. Crosby v. State Dep't of Budget & Fin., 76 Hawaiʻi 332, 340, 876 P.2d 1300, 1308 (1994).

Findings of fact are reviewed under the "clearly erroneous" standard. Birano v. State, 143 Hawaiʻi 163, 181, 426 P.3d 387, 405 (2018). A finding of fact is clearly erroneous

when the record lacks substantial evidence to support the finding or when, despite some evidence to support the finding, we are left with the definite and firm conviction in reviewing all of the evidence that a mistake has been committed. Id. "[S]ubstantial evidence" is "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." In re Grievance Arbitration Between State of Hawaiʻi Organization of Police Officers and County of Kauaʻi, 135 Hawaiʻi 456, 462, 353 P.3d 998, 1004 (2015) (citations omitted).

Conclusions of law are reviewed under the "right/wrong" standard. Estate of Klink ex rel. Klink v. State, 113 Hawaiʻi 332, 351, 152 P.3d 504, 523 (2007). A conclusion of law that is supported by the trial court's findings of fact and reflects an application of the correct rule of law will not be overturned. Id. When a conclusion of law presents mixed questions of fact and law, we review it under the "clearly erroneous" standard because the court's conclusions are dependent on the facts and circumstances of each individual case. Id.

## DISCUSSION

### 1. The family court's questioning of witnesses did not deprive JK of due process.

JK contends the family court violated his constitutional right to due process by questioning witnesses and eliciting improper evidence upon which it based the Order Granting Petition for Involuntary Hospitalization. JK did not object to the family court's questioning of Dr. McGrath or to its

calling or questioning of JK's spouse, or otherwise raise this issue below.  Accordingly, we review for plain error.

> In civil cases, the plain error rule is only invoked when "justice so requires."  We have taken three factors into account in deciding whether our discretionary power to notice plain error ought to be exercised in civil cases: (1) whether consideration of the issue not raised at trial requires additional facts; (2) whether its resolution will affect the integrity of the trial court's findings of fact; and (3) whether the issue is of great public import.

WW v. DS, 149 Hawaiʻi 123, 130, 482 P.3d 1084, 1091 (2021) (citations omitted).

A trial judge has discretion to question a witness. Sprattling, 99 Hawaiʻi at 317, 55 P.3d at 281.  This discretion is particularly broad when questioning witnesses during a hearing on a petition for involuntary hospitalization.  "In [jury-waived trials and hearings on evidentiary motions], it is the judge who is the trier of fact, and, accordingly, there is no possibility of jury bias; under the circumstances, the judge's duty to clarify testimony and fully develop the truth in the case becomes particularly heightened."  Id. at 322-23, 55 P.3d at 286-87 (quoting State v. Hutch, 75 Haw. 307, 326 n.8, 861 P.2d 11, 21 n.8 (1993)).  "However, when conducting such questioning, the trial court must not exhibit bias or advocate for either party[,]" nor should it "conduct an unduly extended examination of any witness."  Id. (citations omitted).

In this case, the family court questioned Dr. McGrath on his testimony — elicited by the State — about what he had been told by JK's family members.  Dr. McGrath testified that the family:

brought up the issue of . . . [JK] stating things about a straight razor to his son and using a straight razor and being able to put his finger through metal because God had given him that power.

. . . [T]he family was scared by these things and that was partly what led to him being brought to the emergency department.

The family court asked Dr. McGrath:

Is there any specific incidences [sic] where he attempted to do this to the detriment of his safety or others?

Like for instance using a straight razor, did he actually do it or was he just talking about it and that's what got them afraid?

THE WITNESS: Correct.  Your Honor, I have limited information as to whether an -- or a razor was on the table or whether it was being -- I don't know 'cause I don't have that information.

THE COURT: Okay.  And, uh, what about putting finger through metal?  Did -- was there an actual incident that that [sic] occurred pursuant to the --

THE WITNESS: The report was --

THE COURT: -- statements of the family?

THE WITNESS: The report of the family was that he had stated to the son that he wanted the son to -- to watch how he could put his finger through metal because God had given him the ability to put his finger through a metal container, and the son was disturbed and frightened by this 'cause it clearly was a [sic] indication of not --

THE COURT: Right.

THE WITNESS: -- reasonable thinking.

THE COURT: Well, I -- okay.  *So there's no actual incident where he actually injured himself by doing that* --

THE WITNESS: No.  No.

THE COURT: -- *or was injurious of others?*

THE WITNESS: *Not to my knowledge.*

THE COURT: Okay.  Thank you.

(Emphasis added.)

Dr. McGrath also testified — in response to questions by the State — that he was not aware of any alternative programs or facilities on Hawaiʻi Island that were less restrictive than Kona Community Hospital's Kalani Ola Behavioral Health Unit. The family court then asked him:

> If he were to be released where would he go? Do you know?
>
> THE WITNESS: Uh, from statements that have been made by [JK] my assumption is that he would return home.

JK's spouse was present in the courtroom during the hearing on the State's petition. The family court asked her:

> So I do have a question. If [JK] is released, uh, Doctor McGrath said that he's actually -- that he thinks that he'll be going -- the -- the place for him to go would be home. I wanna ask [JK's spouse]. If he were --
>
> [JK's SPOUSE]: Yes, Your Honor.
>
> THE COURT: -- to be released today is he coming home?
>
> [JK's SPOUSE]: At this time I don't think my husband would be safe -- my -- my child and I would be safe with my husband coming home without treatment. I'm very concerned for his health and his safety as well.
>
> THE COURT: Ma'am, why don't -- why don't you come up here? Let's have you sworn in.

JK's spouse took the witness stand and was sworn. She described her observations of JK, including the incident about the straight razor: "he then stated that he had such a steady hand that he could do all these things like the monks could do and that God would use him as a vessel."

The family court then stated:

> I think I understand what you're describing here. One of the things that I have to make a decision on is whether [JK] is imminently dangerous to himself or to others.

> Now, what you've described is a lot of bizarre behavior, um, but -- but I'm really focusing upon that one aspect of what I have to make a decision on.
>
> And so if you can tell me what has he done in the past? Maybe that would be -- **what has he done in the past that actually hurt either himself or others?**

(Emphasis added.) After JK's spouse responded, the family court gave the State and JK the opportunity to cross-examine. The State cross-examined; JK had no questions. JK called no witnesses after the State rested.

The family court's questioning of Dr. McGrath and JK's spouse was limited to issues properly raised by the State's petition under HRS § 334-60.2, and was appropriate in light of the family court's "heightened" "duty to clarify testimony and fully develop the truth[.]" Sprattling, 99 Hawaiʻi at 323, 55 P.3d at 287. The family court did not "exhibit bias or advocate for either party[,]" nor did it "conduct an unduly extended examination" of either witness. Id. at 322-23, 55 P.3d at 286-87 (citations omitted). We decline to hold that the family court plainly erred by questioning the witnesses; JK was not thereby deprived of due process.

## 2. The family court did not err in finding that JK was mentally ill.

JK challenges "[t]he family court's Conclusion of Law #G in its Order Granting Petition for Involuntary Hospital-ization[.]" The order stated:

> Upon full consideration of the above exhibit and the testimony and other evidence adduced at the hearing, the court makes the following findings of fact:
>
> . . . .

> G.      [JK] is mentally ill, beyond a reasonable doubt,
>        in that [JK] suffers from a <u>bipolar disorder
>        (manic phase)</u>.

A finding that the respondent is mentally ill must be established "beyond a reasonable doubt[.]"  HRS § 334-60.5(j).  The finding is supported by substantial evidence; that is, the Certificate and opinion testimony by Dr. McGrath.  There was no evidence controverting Dr. McGrath's opinion.

JK's sole argument — made for the first time on appeal — is that Dr. McGrath's opinion was inadmissible because he was never qualified as an expert witness.  Dr. McGrath testified that he was the "attending psychiatrist" at the Kalani Ola Behavioral Health Unit at Kona Community Hospital, and JK's psychiatrist.  JK did not object or move to strike Dr. McGrath's testimony that "the working diagnosis is a bipolar disorder manic[.]"  JK's failure to object to Dr. McGrath's opinion testimony constituted a waiver of objections to Dr. McGrath's qualifications under Rule 702 of the Hawaii Rules of Evidence (**HRE**).[2]  <u>See</u> <u>Kemp v. State Child Support Enf't Agency</u>, 111 Hawaiʻi 367, 391, 141 P.3d 1014, 1038 (2006) ("As a general rule, if a party does not raise

---

[2]      Rule 702, Hawaii Rules of Evidence, Chapter 626, Hawaii Revised Statutes (2016) provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.  In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

an argument at trial, that argument will be deemed to have been waived on appeal[.]") (citations omitted).[3]

Moreover, JK does not challenge the family court's finding of fact K., which stated:

> K.      Michael McGrath, M.D., a licensed physician and psychiatrist, personally examined [JK], was present at the hearing, and gave oral testimony at the hearing.

JK did not impeach Dr. McGrath on cross-examination, nor did he offer any evidence to contradict Dr. McGrath's diagnosis of his mental illness. The family court's finding that JK was mentally ill beyond a reasonable doubt was not error.

**3.      The family court erred by concluding that JK was imminently dangerous to himself or to others.**

JK challenges the "family court's Conclusion of Law #H in its Order Granting Petition for Involuntary Hospitalization[.]" The order stated:

> H.      By clear and convincing evidence [JK] is imminently and substantially dangerous to self or others.

Paragraph H. is a mixed finding of fact and conclusion of law; under HRS §§ 334-60.2(2) and 334-60.5(j) a person may be involuntarily hospitalized only if the family court finds, "by clear and convincing evidence," that "the person is imminently dangerous to self or others[.]"

---

[3]      JK stipulated — before entry of the Order Granting Petition for Involuntary Hospitalization — that Dr. McGrath was qualified to express opinions under HRE Rule 702 during the December 12, 2017 hearing on the State's motion for an order authorizing the involuntary administration of medication.

"Clear and convincing evidence" is:

> an intermediate standard of proof greater than a
> preponderance of the evidence, but less than proof beyond a
> reasonable doubt required in criminal cases.  It is that
> degree of proof which will produce in the mind of the trier
> of fact a firm belief or conviction as to the allegations
> sought to be established, and requires the existence of a
> fact be highly probable.

Masaki v. Gen. Motors Corp., 71 Haw. 1, 15, 780 P.2d 566, 574
(1989) (citations omitted).  Hawai'i appellate courts have not
addressed the standard of review for a finding of fact that must
be based upon "clear and convincing evidence."  We adopt the
standard recently articulated by the California Supreme Court in
Conservatorship of O.B., 470 P.3d 41 (Cal. 2020).

The California law concerning "clear and convincing
evidence" is similar to that articulated in Masaki.  Under
California law:

> The standard of proof known as clear and convincing
> evidence demands a degree of certainty greater than that
> involved with the preponderance standard, but less than what
> is required by the standard of proof beyond a reasonable
> doubt.  This intermediate standard "requires a finding of
> high probability."

Conservatorship of O.B., 470 P.3d at 46 (citations omitted).

Regarding the standard of review on appeal applicable
to findings of fact that require proof by clear and convincing
evidence, the California Supreme Court held:

> To summarize, we hold that an appellate court must
> account for the clear and convincing standard of proof when
> addressing a claim that the evidence does not support a
> finding made under this standard.  When reviewing a finding
> that a fact has been proved by clear and convincing
> evidence, the question before the appellate court is whether
> the record as a whole contains substantial evidence from
> which a **reasonable factfinder** could have found it **highly
> probable** that the fact was true.  In conducting its review,

> the court must view the record in the light most favorable
> to the prevailing party below and give appropriate deference
> to how the trier of fact may have evaluated the credibility
> of witnesses, resolved conflicts in the evidence, and drawn
> reasonable inferences from the evidence.

Id. at 55 (emphasis added).  The California Supreme Court also cautioned:

> [W]e use this opportunity to emphasize that as in criminal
> appeals involving a challenge to the sufficiency of the
> evidence, an appellate court reviewing a finding made
> pursuant to the clear and convincing standard does not
> reweigh the evidence itself.  In assessing how the evidence
> reasonably could have been evaluated by the trier of fact,
> an appellate court reviewing such a finding is to view the
> record in the light most favorable to the judgment below; it
> must indulge reasonable inferences that the trier of fact
> might have drawn from the evidence; it must accept the
> factfinder's resolution of conflicting evidence; and it may
> not insert its own views regarding the credibility of
> witnesses in place of the assessments conveyed by the
> judgment. . . . [T]he question before a court reviewing a
> finding that a fact has been proved by clear and convincing
> evidence is not whether the appellate court itself regards
> the evidence as clear and convincing; it is whether a
> reasonable trier of fact could have regarded the evidence as
> satisfying this standard of proof.

Id. at 53.  It is under this standard that we review whether the evidence before the family court, viewed in the light most favorable to the State, could have led a reasonable fact-finder to the conclusion that it was highly probable JK was imminently dangerous to himself or others, under the applicable statutory definitions.

### A.    Imminently Dangerous

Under HRS § 334-1, a person is "imminently dangerous to self or others" if, "without intervention, the person will likely become dangerous to self or dangerous to others within the next forty-five days."  Dr. McGrath testified that JK "stated to staff that he does not intend to take medications once he leaves the

17

hospital because there is nothing wrong with him."  Dr. McGrath then opined:

> Because of the aforementioned lack of insight and judgment and his own admission that he does not intend to take medication after leaving it is my opinion that if he were to be given the opportunity to attempt to be treated as an outpatient the severity of these symptoms would escalate, the dangerousness would become imminent within 45 days and there would be **some harm**.

(Emphasis added.)  Dr. McGrath did not specify what he meant by "some harm."  He agreed that it was his opinion JK would "be a danger to himself . . . or others within the next 45 days if he were to be released[.]"  However, he did not specify the nature of the "danger" JK posed, to himself or to others.

### B.    Dangerous to Self

Under HRS § 334-1:

> "Dangerous to self" means the person recently has:
>
> (1)    **Threatened or attempted suicide or serious bodily harm**; or
>
> (2)    Behaved in such a manner as to indicate that the person is unable, without supervision and the assistance of others, to satisfy the need for nourishment, essential medical care, shelter or self-protection, so that **it is probable that death, substantial bodily injury, or serious physical debilitation or disease will result unless adequate treatment is afforded**.

In response to his testimony about JK's belief that "he could put his finger through metal because God had given him the ability to put his finger through a metal container," the family court asked Dr. McGrath:

> Well, I -- okay. So there's no actual incident where he actually injured himself by doing that --

THE WITNESS: No. No.

THE COURT: -- or was injurious of others?

THE WITNESS: Not to my knowledge.

On cross-examination, Dr. McGrath testified:

> Q. Um, now, do you -- has [JK], um, had any violent outbursts at the hospital?
>
> A. No overtly violent outburst, no.
>
> Q. And no attempts at self harm?
>
> A. No.

JK's spouse explained that the incident concerning the straight razor did not involve JK actually using a straight razor, or trying to force their son to use one:

> Q. What, uh, tell me more about the razor.  I'm -- I'm trying to visualize exactly what [JK] did with the razor as it relates to your 13-year old son.
>
> A. He was showing my son how to shave although he had already taught him how to shave, and he was demanding that my son take the double-sided old-fashioned razor and use that because he was **going to be getting** a straight razor **for himself**.
>
> When my son said, "Dad, no, you don't need to do that.  It's okay.  I have a safety razor," he then stated that he had such a steady hand that he could do all these things like the monks could do and that God would use him as a vessel.

(Emphasis added).

JK's spouse also described JK refusing to sleep; leaving the house "around 3, 4:00 in the morning"; and "drinking water and eating protein bars, an occasional piece of fruit with it and that was it[.]"  She explained:

> He would claim he needed to go to the gym two to three times a day, um, and that he needed to work out and so that he was wanting to build up muscle mass, and that's why he wanted to

> continue to have nothing but the protein bars 'cause it had everything his body needed is what he claimed to me.

There is no evidence in the record that JK had recently threatened or attempted suicide or serious bodily harm, as described under HRS § 334-1. Further, as to the second part of the definition of "dangerous to self" this court has stated:

> To be considered "dangerous to self" under the Hawaiʻi statutory scheme . . . it is not enough that an individual is unable to satisfy the need for nourishment, essential medical care, shelter or self-protection without supervision and assistance of others. There must also be clear and convincing evidence that the individual's inability to satisfy [their] need for nourishment, essential medical care, shelter or self-protection without supervision and assistance of others *will probably* result in ***death, substantial bodily injury, or serious physical debilitation or disease unless adequate treatment is afforded to the individual***.

In re Doe, 102 Hawaiʻi at 554, 78 P.3d at 367 (second emphasis added). Here, Dr. McGrath testified that the danger to JK would become imminent in 45 days and there would be "some harm." Dr. McGrath's testimony was not sufficient to allow a reasonable factfinder to find it highly probable that JK's condition would result in his death, substantial bodily injury, or serious physical debilitation or disease unless adequate treatment was afforded to him. Further, JK's spouse's testimony about JK's irregular sleep and diet, unconventional behavior, and refusal to take medication,[4] without more, was not sufficient to allow a reasonable fact-finder to find it highly probable that JK posed

---

[4] We note that the family court's December 19, 2017 order denying the State's motion to authorize involuntary administration of medication contains a "finding that there is no evidence that [JK] actually poses a danger of physical harm to himself or others."

an imminent danger to himself within the meaning of HRS §§ 334-1 and 334-60.2.

### C.    Dangerous to Others

Under HRS § 334-1:

> "Dangerous to others" means likely to do substantial physical or emotional injury on another, ***as evidenced by a recent act, attempt or threat***.

When delivering its decision the family court acknowledged:

> Uh, the Court agrees with [JK], uh, there's been no evidence presented that, uh, anything that was done with the straight razor, uh, was harmful or dangerous to anyone.  Uh, he -- there's no indication that he used it to threaten someone with, uh, or that he actually cut someone or himself with it.  Uh, he was simply trying to teach his son how to shave.

The family court was charged with making an extremely difficult decision — whether to significantly deprive JK of his liberty — in light of JK's spouse's concern that she and their child would not be safe if JK came home without treatment, and that JK would be a threat to himself as well.  The family court ultimately ruled:

> Now, scaring the family in and of itself is not imminently dangerous to self or others but the conduct is very concerning I think, and I believe that it is dangerous to yourself or others.  So get the help that you need so that you can come out and be -- and continue to be a productive, uh, husband and father to your children.  Okay?

To its credit, the family court recognized the fear and concern expressed by JK's spouse, for herself, for their child, and for JK.  But this is not a case like In re PC, where the respondent was involuntarily hospitalized after he sent

threatening text messages to his parents which included pictures of guns, bullets, and knives; and, after his parents vacated their home out of fear for their safety, plunged a large kitchen knife into his parents' mattress where his father usually slept. 2017 WL 2602003, at *1. There is no evidence in the record that JK had ever acted, attempted, or threatened to inflict substantial physical or emotional injury upon another person, within the meaning of HRS § 334-1. The record does not contain substantial evidence to allow a reasonable fact-finder to find there was a **_high probability_** that JK was dangerous to others **_within the meaning of HRS § 334-1_**. The family court erred by finding there was clear and convincing evidence that JK was imminently dangerous to others.

## CONCLUSION

For the foregoing reasons, we reverse the "Order Granting Petition for Involuntary Hospitalization" entered by the family court on December 14, 2017.

On the briefs:

Nolan Chock,
Julio C. Herrera,
Deputy Attorneys General,
State of Hawaiʻi,
for Petitioner-Appellee
State of Hawaiʻi
Department of Health.

Saisamoa F. Grey Price,
Deputy Public Defender,
State of Hawaiʻi,
for Respondent-Appellant JK.

/s/ Lisa M. Ginoza
Chief Judge

/s/ Keith K. Hiraoka
Associate Judge

/s/ Karen T. Nakasone
Associate Judge